[No. 31068.   Department Two.   March 20, 1950.]

LESLIE A. LECHNER, *Appellant,* v. LAWRENCE S. HALLING *et al., Respondents.*[1]

[1]Reported in 216 P. (2d) 179.

*Leslie A. Lechner* and *William A. Johnson,* for appellant.

*Kennett & McCutcheon,* for respondents.

ROBINSON, J.—Prior to December, 1947, appellant, Leslie A. Lechner, was the owner of some real property at Darrington, Washington, upon which he operated a beer tavern. Desiring to sell this property, he wrote a letter to the Donahue Realty Company of Seattle, requesting its assistance in the project. The realty company (which we shall hereinafter refer to as "Donahue"), acting through Mrs. C. A. Donahue and her salesman, Mr. Sant, succeeded in finding buyers in the persons of respondents Halling. The price agreed on was thirteen thousand dollars. Mr. Lechner agreed to accept a certain house trailer, in which the Hallings were then living, in lieu of two thousand dollars of this sum, and the rest was to be paid in cash. On December 22nd, an earnest money receipt was executed by the parties, and, pursuant to its terms, Mrs. Halling made out a check for two thousand dollars to the Donahue Realty Company, which she gave to Mr. Sant, the parties agreeing, apparently in accordance with Mr. Lechner's wishes, that the money should be deposited with an escrow holder, and Donahue having been selected for this purpose. At the same time, the certificate of title and the registration certificate for the trailer were delivered by the Hallings to Donahue. The parties orally agreed, however, that the Hallings would retain possession of the trailer, and con-

tinue to live in it, until such time as the occupants of the apartment above the tavern, into which the Hallings desired to move, were able to find another place to live. On December 24th, in Mr. Lechner's office, the Hallings paid the remaining nine thousand dollars to Mr. Sant. On the same date, the following writing was executed by Donahue:

"This is to certify that Lawrence S. Halling and Dorothy A. Halling his wife has this 24th day of December, 1947 paid to the C. A. Donahue Realty, the sum of $2000.00 paid as earnest money on December 23, 1947, also a check for $9000.00 December 24, 1947, title received for trailer license No. T L F 1091 valued at $2000.00, making a total of $13,000.00 as full purchase price of the Pioneer Tavern, located at Darrington, Wash. Said moneys to be held in escrow until title insurance, license, warranty deed, together with bill of sale of all equipment.

C. A. Donahue Realty<br>By Dorothy Null, Bkr."

No written instructions were given by the Hallings to Donahue, and the above receipt is the only evidence of the conditions under which the latter was authorized to deliver the money to Mr. Lechner.

Prior to the end of December, the Hallings took possession of the tavern. About this time there arose a dispute over the amount of inventory on hand. The parties agreed to take an inventory, and, if the merchandise exceeded five hundred dollars in value, the Hallings were to pay the excess amount. The inventory was taken, and it was found to amount to $666.10, increasing the Halling's obligation in the amount of $166.10.

The liquor licenses were transferred to the Hallings on January 8th. On January 13th, Mr. Lechner went to The Citizens State Bank of Arlington and directed it to inform Donahue of the fact that the sum of $2,901.74 was due the bank on certain mortgages held by it upon the property. The bank so advised Donahue, and on the following day Mrs. Donahue paid this sum from the funds in the Halling-Lechner account. The satisfactions of the mortgages were thereupon sent to her.

Also on January 13th, Mr. Lechner executed a warranty deed to the property and a bill of sale for the equipment and inventory, and deposited them, as he testified, "in escrow," with Donahue on the same evening. No written escrow instructions were given by him to Donahue. Mr. Sant testified that he then called Mr. Halling and told him that the deed and other papers had been delivered. On January 21st, Mr. Halling came down to the Donahue office. He gave Donahue a check for $166.10, the amount owing as a result of the inventory. Mrs. Donahue acknowledged a bill of sale for the trailer, which had been executed by the Hallings, and turned over to Mr. Halling the warranty deed and bill of sale for the personal property, which had been deposited with her by Mr. Lechner, and a policy of title insurance for the sale of the real property. On this occasion, Mr. Sant dictated, and Mr. Halling signed, the following:

"January 21, 1948
"To Whom It May Concern:
"This is to certify that we, the undersigners, namely Lawrence S. Halling and Dorothy A. Halling have taken possession of the Pioneer Tavern, Darrington, Wash., including land, building, tavern license, and all equipment, together with a warranty deed and Title Insurance policy for same.
"We, hereby, authorize the payment of any and all money now held in escrow by C. A. Donahue Realty, to the seller, Leslie A. Lechner.
"We will also deliver house trailer to Everett at the request of Leslie A. Lechner.        Lawrence Halling"

We may note that there is some dispute over whether the delivery, alleged to have preceded the drawing up of this writing, actually took place. The trial court, however, in its extensive and well-considered oral opinion, dealt with this point at length, and took the view, which seems supported by the weight of the evidence, that such a delivery had been made. The question being purely one of fact, we shall not take issue with that conclusion.

Immediately after the delivery of the deed, title insurance policy, and bill of sale, Mrs. Donahue testified that the following took place:

"Q. When you handed those instruments to Mr. Halling on January 21st, 1948, what was said by him and what was said by you, and how does it happen they remained in your possession? A. Mr. Halling asked me what he should do with them, and I told him first he must have his warranty deed recorded. He asked me how he went about doing it, and didn't seem to know just what to do, and I suggested that I would record it for him if he would like for me to. And he asked me to do that. At that time the title insurance policy here, in Schedule 'B', it showed taxes and a mortgage that hadn't been cleared. I did, however, have the satisfaction in my possession from the bank,. where the mortgage had been paid off. I had sent the money up and paid it off, but it hadn't been cleared from the title policy. And in talking with Mr. Halling, I suggested that I thought it would be better if we returned the title policy and ordered a new Schedule 'B' after the satisfactions had been filed. Which I did. I returned them. Q. Did he then at that time re-deliver to you— A. (Interposing) He handed them back to me so I could record the deed and to pay the taxes that were due, and file the satisfactions of the mortgage, and get a new Schedule 'B' for the policy."

This testimony was, in general, corroborated by that of Mr. Halling and Mr. Sant, although it is fairly clear from the statements of both of the latter two that Mr. Halling had no very clear idea of why he was leaving the title insurance policy with Mrs. Donahue. All of his testimony, in fact, indicates complete unfamiliarity with the procedure involved in real-estate sales, and throughout the transaction he appears to have acted entirely as others advised.

In any event, Mrs. Donahue paid the taxes and sent the satisfactions of the mortgages which had been outstanding against the property, together with the title insurance policy, to the Snohomish County Abstract Company in order that the mortgage satisfactions might be recorded and the title policy corrected. These things were done, and the mortgage satisfactions and corrected title insurance policy were mailed back to Mrs. Donahue on January 28th.

In the meantime, Mr. Lechner called Mrs. Donahue on January 24th and asked when the transaction could be closed. The substance of the conversation was disputed, Mrs. Donahue testifying that she told Mr. Lechner of the Halling release on this occasion, and Mr. Lechner denying that she did so; but it was agreed that Mrs. Donahue told him that nothing more could be done until the corrected title policy had been returned to her. Mr. Lechner testified that, to the best of his recollection, she stated that this would be in about a week. He then told her that he would go to California and would leave the matter in the hands of his secretary, who testified that Mr. Lechner had indicated to her that he hoped the deal would be closed before his return.

Mr. Lechner went to California on the 28th or 29th. The title insurance policy and mortgage satisfactions were received by Mrs. Donahue, presumably on the 29th. She testified that, when these were returned, there was nothing else preventing her payment of the money to Mr. Lechner. Mr. Lechner's secretary talked to Mrs. Halling and to Mr. Sant during Lechner's absence about "closing the deal," but apparently nothing was discussed except the matter of delivery of the trailer. It does not appear from the testimony that Mr. Lechner had authorized her to receive any money from Donahue, or indeed that at that time he was at all concerned about that aspect of the affair. Mr. Lechner returned from California on February 5th, and learned from his secretary that the transaction had not been "closed."

Had the matter proceeded as the parties had contemplated, there is no doubt that the transaction would have been completed to the satisfaction of all concerned. However, on February 6th, Mrs. Donahue made an assignment of her business to her stepson, and her licenses as a realtor were picked up by the state on February 9th. A receivership followed shortly thereafter. A receiver was appointed on February 17th. Mrs. Donahue was subsequently convicted of embezzlement, and this particular matter was one of the items for which she was convicted. Mr. Halling delivered the trailer to Mr. Lechner, either on February 7th or

February 11th, and he has remained in possession of it. The title insurance policy, the bill of sale for the personal property, and the warranty deed, still unrecorded, were found in the possession of Mrs. Donahue by the receiver, as was also the bill of sale for the trailer.

This action was brought by Mr. Lechner, who alleged in his complaint that he was entitled to recover the purchase price of the property from the Hallings, less, of course, the amount paid by Mrs. Donahue on the mortgages; or, in the alternative, that he was entitled, upon reconveyance of the trailer to the Hallings, and upon payment to them of the amount paid on the mortgages, to a redelivery of the premises. The Hallings answered, alleging that they had fully performed their contract, and praying that Mr. Lechner's action be dismissed and that a decree be entered quieting title to the real property in them. The court found for the defendants Halling, and entered a decree directing the receiver to convey the warranty deed, policy of title insurance, and bill of sale to the Hallings as purchasers, and further directing him to convey the bill of sale to the trailer to Mr. Lechner. Any funds in the hands of the receiver on account of the transaction involved were directed to be paid to Mr. Lechner, as and when distribution was ordered by the court in the receivership proceeding. From this decree, Mr. Lechner has appealed, it being apparent that the one to whom it is finally held that the money belongs will never be able to recover the entire amount.

As the trial court recognized, the rule to be applied in this type of case was laid down by this court in *Lieb v. Webster,* 30 Wn. (2d) 43, 190 P. (2d) 701. It was recently reiterated in *Angell v. Ingram, ante* p. 582, 213 P. (2d) 944. In those cases, we held that, when an escrow agent absconds with money he is holding in his capacity as depositary, the loss must fall upon the person as whose agent he is holding the money at the time. Both cases turned chiefly upon the circumstance that, in each of them, the terms of the escrow instructions given by the purchasers to the depositary had not been complied with at the time

the latter absconded with the funds he was holding. Applying the rule, as above stated, we held that he was still holding the money as the agent of the purchasers, and that, as between them and the sellers, they, the purchasers, must stand the loss.

Mr. Lechner urges that an analogous result must be reached in the present inquiry. He contends that the money involved in this case was received by Donahue as agent for the Hallings, that Donahue never ceased to hold it for them, and that, consequently, under the holding of the *Lieb* and *Angell* cases, the Hallings must bear the loss. In order to decide whether or not he is correct in this contention, it is first necessary to determine whether all the conditions, which respondents Halling attached to the disbursement of the funds, were fulfilled prior to delivery of the deed and other instruments to them.

Although no formal instructions were given by the Hallings to Donahue, it would appear, from the receipt executed by Donahue on the occasion of the nine thousand dollar payment to it, that Donahue was to hold the money until a policy of title insurance, the liquor license, a warranty deed, and a bill of sale of the personal property had been delivered by Mr. Lechner. Mr. Sant testified that the following occurred after this delivery had been made:

"A. Mr. Lechner brought the deed in I think a couple days after the date on there. I am not sure of the dates. Then I called Mr. Halling and told him that it was there and everything was there, and so Mr. Halling came down and signed all the releases releasing Mr. Lechner of any further obligations."

Even if the receipt executed by Donahue, not having been signed by either Mr. Halling or his wife, cannot for that reason be considered valid evidence of the conditions under which Donahue was to take possession of the money on their behalf, nevertheless, the written release, signed by Mr. Halling on January 21st, fully indicates his intention to part with all right to the money. In that release, it is true that Mr. Halling stated that he "authorized" the payment of the money "now held in escrow" to Mr. Lechner, and some

contention is made that this had no other effect than to constitute Donohue his agent to pay the money to Mr. Lechner in the future. But the trial court said, concerning this language:

"True, he used the word 'authorized,' or he adopted it, because some other dictated the language—he 'authorized' the payment of all this money to Mr. Lechner. Now, while the word 'authorized,' as counsel for Mr. Lechner contends, is an appropriate and a proper word in the constitution of another one as an agent, I think when this instrument is read in its entirety, in the light of all the evidence in the case and of what these people have done before and since, that it was no more or less than the declaration by Lawrence Halling on his own and his wife's behalf that no further right in that money resided in them. It is the disclaimer of any right in such."

We agree with the trial court that the most logical inference from this language is that Mr. Halling intended to divest himself of all right to the money—that he intended, in other words, that Donahue should cease to hold it for him as his agent. Therefore, the situation is precisely the reverse of that presented in the *Lieb* and *Angell* cases, and, applying the principle there laid down, an opposite result is required, to the effect that all of the instructions of the purchaser having been complied with by January 21st, the depositary, Donahue, thereafter held the money as the agent of the seller, Lechner. Although there is some suggestion in the evidence that, on the date of the signing of the release, Donahue's escrow obligations, as a whole, were considerably greater than the amount on deposit in her escrow account, it appears that, exclusive of the item of $166.10, for which she received a check on that day, she had sufficient money deposited to have paid the full sum owing to Mr. Lechner at the time when Mr. Halling signed the release. Therefore, on the basis of the evidence before us, we are unable to say that Donahue did not cease to hold the money as agent of Mr. Halling and take possession of it as agent for Mr. Lechner.

But there is an additional problem in this case resulting from appellant's contention that Donahue had no au-

thority, either to deliver the deed to Mr. Lechner or to collect the money in his behalf. In view of the fact that appellant himself has most vigorously urged that this transaction amounted to a deposit in escrow, the first of these conditions is particularly difficult to understand. In the early case of *Bronx Inv. Co. v. National Bank of Commerce,* 47 Wash. 566, 92 Pac. 380, we defined an "escrow," taking the definition from 16 Cyc. 561, as follows:

" 'An escrow is a written instrument, which by its terms imports a legal obligation, deposited by the grantor, promisor, or obligor, or his agent with a stranger or third person, . . . *to be kept by the depositary until the performance of a condition or the happening of a certain event, and then to be delivered over to take effect.*' " (Italics ours.)

Once deposited in escrow, an instrument passes beyond the control of the depositor, and he may not recall it. 30 C. J. S. 1198, Escrows, § 5b. Upon the performance of the condition named, the depositary must deliver it to the grantee. A deposit in escrow, therefore, amounts, by its terms, to a conditional delivery (4 Tiffany, Real Property (3d ed.), p. 226, § 1048), and if the instruments involved in this case were, as appellant contends, so deposited, it is idle for him to assert that Donahue had no authority to deliver them. However, the lack of any written escrow instructions from Mr. Lechner to Donahue, the fact that Mr. Lechner testified that he never saw the receipt which was the only evidence of any such instructions from the Hallings to Donahue, and the general vagueness and informality of the whole transaction, have resulted in some uncertainty as to the conditions upon which such delivery was to be made, and caused the trial court to question whether there had been any valid escrow agreement whatsoever. Plainly, he was justified in this doubt, for there can be no escrow unless the delivery of the instrument by the depositary to the grantee or obligee is conditioned upon the performance of some act, or the happening of some event (*McPherson v. Barbour,* 93 Ore. 509, 183 Pac. 752; 19 Am. Jur. 422, Escrow, § 6); and it is essential to the constitution of an escrow, not only that the grantor and the grantee are at one as to the conditions

under which the deposit is to be made, but that such conditions should be communicated to the depositary. 130 Am. St. 932.

■ But that the conditions upon which an instrument is deposited in escrow may rest in, and be proved by, parol (however desirable it may be that they be expressed in writing, 7 Thompson on Real Property (Perm. ed.) 678, § 4204, as this case amply demonstrates) is well settled in this state as elsewhere. *Nichols v. Oppermann,* 6 Wash. 618, 34 Pac. 162; *Manning v. Foster,* 49 Wash. 541, 96 Pac. 233; 126 Am. St. 876, 18 L. R. A. (N.S.) 337; *McLain v. Healy,* 98 Wash. 489, 168 Pac. 1. Where there is a deposit of instruments, allegedly in escrow, and conflict in the testimony as to the understanding of the parties relative to the conditions of deposit, it is proper for the court to inquire into the facts and circumstances surrounding the transaction, in order to determine first, whether the parties intended a true conditional delivery, and second, whether they were in agreement as to the nature of the conditions, performance of which would authorize the depositary to convey to the grantee. Where a written instrument, importing a legal obligation, is deposited by a grantor with a third party, to be kept by the depositary until the grantee pays a stipulated sum, and then to be delivered over to the grantee, an escrow is created. *Foulkes v. Sengstacken,* 83 Ore. 124, 163 Pac. 311, reversing on rehearing 83 Ore. 118, 158 Pac. 952. If the evidence reveals such a situation, the transaction will be treated as a deposit in escrow, regardless of whether the parties have employed that term. *Bronx Inv. Co. v. National Bank of Commerce,* 47 Wash. 566, 92 Pac. 380. Where they have employed it, however, as is the case here, that is a circumstance which must be taken into account, as the use of the word "escrow" by any of the parties indicates more clearly than any other their actual intention. *Foulkes v. Sengstacken, supra.*

We think the evidence, considered as a whole, reveals the existence of a valid escrow agreement, and a mutual understanding among the parties as to the conditions of

deposit. Respondents' analysis of the transaction, which is supported by the evidence, indicates the nature of these conditions. It is as follows:

"The evidence consists of the fact that Lechner placed in Donahue's hands a warranty deed to the property involved, a bill of sale to the personal property, a policy of title insurance, a statement of the amount of the inventory, a statement of the amount due on the real estate mortgage and chattel mortgage held at the Arlington bank. These instruments were all placed by appellant in the possession of Donahue on January 13, 1948 or prior thereto with full knowledge on the part of the appellant that Donahue then had in her possession $11,000.00 in cash and the title to the house trailer, all of which he was to receive from respondents as and when he was in a position to transfer to respondents good title to the property involved in the transaction."

As we have noted, Mr. Sant testified that, when Mr. Lechner brought in the deed, he called Mr. Halling and told him that "everything was there," and that Mr. Halling came down and signed the release. Mrs. Donahue testified that Mr. Lechner was informed of this when he telephoned her on January 24th. Her testimony was as follows:

"Q. On that occasion did you have any conversation with him concerning the fact that Hallings had signed the release? A. Yes, sir, I did. I told him I was prepared to pay off; that Mr. Halling had given me the authority as soon as this came back. . . . Q. Are you positive, Mrs. Donahue, that on January 24th that you advised Mr. Lechner that Hallings had released this matter to you, or had signed the release authorizing you to close the deal? A. Yes, sir, I certainly am."

If this testimony is to be believed, it would seem to indicate quite clearly that it was Mr. Lechner's understanding that Mrs. Donahue was authorized to deliver the various instruments to the Hallings and to take possession of the purchase money on his behalf. However, even if Mr. Lechner's statement, that Mrs. Donahue told him nothing of the release on this or any other occasion, is accepted, his subsequent conduct indicates that this was his understanding of the matter. He went to California, knowing, as both he and Mrs. Donahue testified, that the transaction could be closed

(as he put it) and the payoff made (as she put it) within a week; and, though he had authorized his secretary to "close" the transaction during his absence, he said nothing to her about taking possession of the money, but seemed only concerned with getting delivery of the trailer. The logical explanation of this, as the trial court concluded, is that:

"Mr. Lechner was not concerned about the money, and its payment to him, because it was in the hands of one whom he had selected as his agent, and whom he had confidence in."

Tending, to some extent at least, to support respondents' contention that Mr. Lechner knew of the delivery of the instruments to the Hallings, and that he consequently acquiesced in Donahue's holding the purchase money for his benefit, is the fact that he signed an assignment of a fire insurance policy on the tavern, reading as follows:

"The ownership of the property described in the attached policy of the insurance company below named, . . . *having actually passed* to Lawrence Halling . . . the undersigned, for value received, hereby transfers and assigns unto said transferee all the title and interest of said undersigned in said policy, subject to all the terms and conditions thereof. . . . [Italics ours.]

Leslie A. Lechner"

This assignment is not dated; however, the insurance company's consent to the assignment, which follows it on the form used, is dated February 2, 1948, indicating that the assignment was signed prior to that time.

We think the fairest inference to be drawn from the whole of the evidence is that Donahue, upon receipt, on the one hand, of all of the papers necessary to give the Hallings good title to the property, and, on the other, of all of the money making up the purchase price and the papers necessary to give good title to the trailer, was authorized to deliver the former to the Hallings and to take possession of the latter for the benefit of Mr. Lechner. This having apparently been the understanding of all of the parties, the deposit created a valid escrow, and Mrs. Donahue's delivery

of January 21st, being in accord with the conditions thereof, was fully effective.

Appellants seek to show, however, that it was the understanding of the parties that the trailer had to be delivered before Donahue had the right to transfer the instruments. The argument appears to be based on the premise that Donahue had no authority to make a delivery until the full consideration had passed—in other words, that this was a condition of the deposit in escrow—and that at the time of the delivery the Hallings still retained possession of the trailer. It is, of course, true, as we declared in *Angell v. Ingram, supra,* that the general rule is:

" ' . . . that where an instrument placed in escrow is thereafter delivered by the escrow holder in violation of, or without compliance with, the terms or conditions of the escrow agreement, such attempted delivery is inoperative and no title or rights pass by virtue of the second tradition, for the reason that in legal contemplation there has been no effective delivery.' (19 Am. Jur. 439, Escrow, § 21)."

We are not convinced, however, that physical delivery of the trailer was a necessary condition precedent to the taking effect of the deposit in escrow. The Hallings delivered the certificate of title, the registration certificate, and bill of sale to the trailer to Donahue, and they retained physical possession of the trailer itself only by reason of a separate oral agreement, by the terms of which Mr. Lechner had permitted them to live in it until such time as they could move into the apartment above the tavern. It may have been, as Mr. Lechner's secretary testified, that it was understood between Mr. Lechner and the Hallings that the trailer would have to be delivered to him in Everett at the time when the licenses thereto were transferred. But this agreement, if such an agreement was actually made, does not appear to have been a condition of the contract. No written mention of it occurs in the earnest money receipt, or elsewhere; the earnest money receipt, in fact, refers only to transfer of the title to the house trailer, and does not mention delivery of the trailer itself. In any case, it does not appear that Donahue had any responsibilities relative

to the delivery of the trailer, or any particular concern with the time when it was to be delivered. The testimony on the point is illuminating. Mr. Sant, on being questioned by Mr. Lechner, testified, in his deposition, as follows:

"Q. Do you recall, Mr. Sant, that I told you on perhaps more than one occasion that the trailer had to be delivered to me in order that I would be able to accept it before we would close the deal? A. Well, there is nothing in our conversation that said that it had to be delivered before you could close the deal as far as, — (pausing). There was never any dispute about delivering the trailer, only that it was to be delivered when you told them to. Q. Didn't you agree to see to it that the trailer was delivered? A. Well, as I understood that, they *was* to deliver the trailer at your request. Q. I think your answer is not responsive. A. Well, I don't remember of ever guaranteeing any delivery on the trailer. We had the bill of sale of the trailer but there was no time or date set as to when the trailer was to be delivered as far as I know."

Mrs. Donahue testified, referring to a conversation between Mr. Lechner and Mr. Halling:

"And there was discussion over the delivery of the trailer, something about that in the beginning, but that I think was cleared up between the two of them."

And later:

"Q. You don't of your own knowledge have any knowledge as to when the trailer was delivered, do you, Mrs. Donahue? A. No. That was not my concern."

In view of this testimony, the trial court's conclusion, which follows, seems sound:

"I do not think it ever was the purpose of the parties to that later oral agreement relative to the delivery of the trailer to constitute the terms of that oral agreement any covenant or term or condition of the transaction of sale of the Pioneer Tavern and its equipment, or of the exchange, as part of the purchase price of that trailer. I do not discern that the Donahue Realty Company, as agent or as escrow holder, ever had any real interest, legally speaking, in the time when that trailer should be delivered."

Appellant also calls our attention to the paragraph of the earnest money receipt reading as follows:

"Two thousand dollars and no cents ($2000.00) receipted herein; Balance of Nine thousand dollars ($9000.00) cash to be paid and title to house trailer to be transferred at time of closing and transfer of licenses. Provided, however, seller shall be secure as to present application of transfer of licenses."

Appellant asserts that the transaction was never actually closed, and that, since "time of closing" was the occasion specified for payment, Mrs. Donahue's acceptance of the money and instruments necessary for the transfer of title to the trailer was premature and not binding on Mr. Lechner. But what did the parties mean by "time of closing"? Appellant himself suggests, in his brief, that:

"A bargain is closed when nothing mutual remains to be done to give either a right to have it carried into effect," citing *Mactier's Administrators v. Frith,* 6 Wend. (N. Y.) 103, 21 Am. Dec. 262.

When Mrs. Donahue, on January 21st, handed over the deed, bill of sale, and policy of title insurance to Mr. Halling, and, after acknowledging the bill of sale for the trailer, accepted from him a check for the remaining $166.10 of the purchase price, the transaction was fully completed as between the two parties. Save for the obligation of the Hallings to deliver the trailer, which we have already decided was not a condition of the contract, nothing remained for either of them to do. It is true that the transaction was not "closed" as between Mr. Lechner and Mrs. Donahue. When he called her on January 24th, she indicated to him that she "could not and would not"—to use her own words —deliver the money to him until the corrected title insurance policy had been returned to her; and appellant's position seems to be that, under these circumstances, she could not have been holding the money for him. But, as she testified, her refusal to pay him was a matter of her own policy. She stated:

"I don't make a pay-off from my office until all the instruments have been returned from the recorder's, or at least a title insurance policy back showing they had been recorded. That was my practice in all of my dealings."

The fact that the money was withheld from Mr. Lechner by his agent on the 24th did not make it any the less his (*In Re Assessment of Alleged Omitted Property*, 177 Okla. 74, 58 P. (2d) 134), and in any case was no concern of the Hallings, who had parted with all their right to it. The matter was one properly to be adjusted between Mr. Lechner and Mrs. Donahue.

We think it not a strained or forced construction of the phrase "time of closing" to interpret it to mean the time when both parties were prepared to deliver all of the items necessary to complete the transaction. This occurred on January 21st, and Mrs. Donahue was, therefore, authorized to receive the money on behalf of Mr. Lechner at that time.

The case is not free from doubt, due chiefly to the numerous conflicts in the testimony on many important issues. Such conflicts are, of course, quite understandable, since, by and large, they relate to minor details of the transaction, which doubtless seemed of little importance to the parties at the time they occurred, and which only assumed significance on the occasion of Mrs. Donahue's unexpected defalcation. Nevertheless, the whole of the evidence seems to justify the conclusion that there was a valid escrow agreement between the parties and that it was completely performed on January 21st, when Mrs. Donahue delivered the deed, bill of sale, and title insurance policy to the Hallings. Whether Mr. Lechner learned of this delivery on January 24, or whether he only anticipated that it would occur while he was in California, is immaterial, as a delivery would have been effective at any time after he had placed all the instruments, necessary to pass good title, in Donahue's hands. From the time of the delivery, Donahue held the purchase money as agent for Mr. Lechner, and, therefore, Mr. Lechner, rather than the Hallings, must bear the burden of the subsequent loss.

The decree is affirmed.

MALLERY, HILL, and HAMLEY, JJ., concur.

SIMPSON, C. J., concurs in the result.