**Ingemar JOHANSSON et al., Appellants,**

v.

**UNITED STATES of America,
Appellee.**

**No. 19990.**

United States Court of Appeals
Fifth Circuit.

Sept. 2, 1964.

Arthur M. Laufer, Manes, Sturim & Laufer, New York City, for appellants Johansson and Scanart, S.A.

Stephen Hochhauser, John A. Kiser, New York City, for appellants Feature Sports, Inc., Thomas Bolan, Roy Cohn and Humbert Fugazy; Saxe, Bacon & O'Shea, New York City, of counsel.

Ashton Phelps, Jack M. Gordon, New Orleans, La., for appellants Thomas Bolan, Roy Cohn and Humbert Fugazy; Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., of counsel.

Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., Lee A. Jackson, Edward F. Boardman, Miami, Fla., John B. Jones, Jr., Harold C. Wilkenfeld, John J. McCarthy, Attys., Dept. of Justice, Washington, D. C., for appellee; William A. Meadows, Jr., U. S. Atty., of counsel.

Before RIVES, BELL and WRIGHT,* Circuit Judges.

RIVES, Circuit Judge.

On three occasions, Ingemar Johansson, a citizen of Sweden, fought Floyd Patterson for the heavyweight boxing championship of the world. All three fights took place in the United States. Taxes in the amounts of $598,181.92 for the calendar year 1960 and $411,620 for the period January 1, 1961, through March 13, 1961,[1] were assessed against Johansson on the income he earned from the Patterson fights and related activities. The Government brought an action against Johansson to collect the taxes' assessed and against Feature Sports, Inc., Thomas Bolan, Roy Cohn, and Humbert Fugazy to foreclose tax liens against funds held by them for Johansson's benefit. The District Court for the Southern District of Florida entered judgment against Johansson for the full amount of the taxes claimed by the Government, plus interest. At the same time, it ordered the other defendants named above to render an accounting of the funds held by them for Johansson and to turn those funds over to the United States. In so ordering, the court refused to allow a setoff of $287,750.60 claimed by the lienees. All the defendants have appealed the judgment and adverse posttrial rulings of the district court.

The first question for this court is whether Johansson may be taxed by the United States on the income he earned from his activities here during the period in question. Section 871(c) of the Internal Revenue Code of 1954 provides that "a nonresident alien individual engaged in trade or business within the United States shall be taxable. * * * [and] the term 'engaged in trade or business within the United States' includes the performance of personal services within the United States at any time within the taxable year, * * * *". Since the express exceptions contained in section 871 are inapposite here, we must view that section as authorizing the assessments involved in this case unless an applicable tax convention requires a contrary result. I.R.C.1954 §§ 894, 7852(d). The Income Tax Convention with Sweden, March 23, 1939, 54 Stat. 1759, T.S. No. 958 (effective Jan. 1,

* Of the D.C. Circuit, sitting by designation.

1. Johansson's taxable year 1961 was declared terminated on the latter date pursuant to section 6851, Internal Revenue Code of 1954.

1940), does not bar the assessments. See article XI(a), (d). However, Johansson claims an exemption under the Income Tax Convention with Switzerland, May 24, 1951 [1951], 2 U.S.T. & O.I.A. 1751, T.I.A.S. No. 2316 (effective Sept. 27, 1951). Particular reliance is placed upon article X(1), which provides:

"An individual resident of Switzerland shall be exempt from United States Tax upon compensation for labor or personal services performed in the United States * * * if he is temporarily present in the United States for a period or periods not exceeding a total of 183 days during the taxable year and * * *

"(a) his compensation is received for such labor or personal services performed as an employee of, or under contract with, a resident or corporation or other entity of Switzerland * * *."

It is undisputed that Johansson was not present in the United States for more than 183 days in either of the tax years in question.[2] But to bring himself within the purview of the treaty, Johansson had to establish (1) that he was a resident of Switzerland and (2) that he received the income in question as an employee of, or under contract with, a Swiss entity.

■ The term "resident" is nowhere defined in the Swiss treaty, but under article II(2) each country is authorized to apply its own definition to terms not expressly defined "unless the context otherwise requires." Johansson contends that, because of its position within the phrase "an individual resident of Switzerland," the term "resident" must be defined according to Swiss law. As conclusive proof that he comes within the Swiss definition of "resident" for tax purposes, he relies upon a determination by the Swiss tax authorities that he became a resident of Switzerland on December 1, 1959. Although the evidence on this point is ambiguous, the determination by the Swiss tax authorities may well have been based primarily upon Johansson's own declaration as to his residence in that country. See Govt. exh. 133–F, Def. exh. I, and Def. exh. J. Be this as it may, we are not bound by the determination of the Swiss tax authorities. Article II(2) does no more than to provide the standard for defining the terms used in the rest of the treaty; the application of that standard to particular facts remains, in this case, the job of the courts.[3] There is no reason to decide whether the applicable standard for defining "resident" as used in the Swiss treaty is to be found in Swiss or American law, for under both laws the criteria are the same. Compare Locher, statement of Dec. 29, 1962, in C.C.H. 1963 Stand.Fed.Tax Rep. Paragraph 6407, p. 71286 ("sojourn * * * with the intention to remain"), with Treas.Reg. § 1.871–2(b) ("intentions with regard to the length and nature of his stay").

■■ Applying this standard to the facts of the present case, the district court concluded that Johansson was not a resident of Switzerland during the period in question. This conclusion is fully supported by the evidence. In the year and a half between the date Johansson claims to have moved to Switzerland and March 13, 1961, the record shows that he spent only 79 days in that country as compared with 120 days in Sweden and 218 days in the United States. Except for his activities in the United States during this period, his social and economic ties remained predominantly with Sweden. Indeed, the summary of Johansson's ties with Switzerland presented in his brief to this Court cites only his maintenance of an apartment and bank account there, his self-declaration of residence, and two acts by the Swiss government that may well have

---

**2.** The figure 183 days was chosen so as to exclude from the article X exemption anyone who spent more than half the taxable year in the United States. Johansson's "taxable year" 1961 lasted 71 days, 58 of which he spent in this country. However, it is not here contended that these facts rendered article X inapplicable to the 1961 tax.

been predicated entirely upon his self-declaration of residence.[3] See Brief on Behalf of Appellants Johansson and Scanart, S. A., pp. 3–6, 9.

■ Even if we were to find that the district court erred in determining that Johansson was not a resident of Switzerland, the tax exemption in the Swiss treaty does not apply unless Johansson received the income in question as an employee of or under contract with a Swiss entity. A contract of employment was entered into by Johansson in December 1959 with Scanart, S.A., a Swiss corporation formed that very month.[4] Scanart's sole employee and sole source of revenue is Johansson, who is entitled under the terms of the contract to seventy per cent of Scanart's gross income, plus a pension fund. All expenses are to be paid by Scanart. During the period in question, Johansson conducted his affairs largely independent of Scanart's sole director or its stockholders. The circumstances surrounding the formation of Scanart, the terms of the contract, and the conduct of the parties under the contract led the district court to find that:

> "Scanart, S.A., had no legitimate business purpose, but was a device which was used by Ingemar Johansson as a controlled depositary and conduit by which he attempted to divert temporarily, his personal income, earned in the United States, so as to escape taxation thereon by the United States." (R., pp. 197–98.)

As with the question of Johansson's residence, the record amply supports this finding.

■ Of course, the fact that Johansson was motivated in his actions by the desire to minimize his tax burden can in no way be taken to deprive him of an exemption to which an applicable treaty entitles him. See Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935). And in determining the applicability of a treaty, we recognize the necessity for liberal construction. Jordan v. K. Tashiro, 278 U.S. 123, 127, 49 S.Ct. 47, 73 L.Ed. 214 (1928). But "To say that we should give a broad and efficacious scope to a treaty does not mean that we must sweep within the Convention what are legally and traditionally recognized to be * * * taxpayers not clearly within its protections; * * * *". Maximov v. United States, 373 U.S. 49, 56, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963). In determining whether the taxpayer in a given case is protected by the terms of a treaty, abstract and desultory definitions of such terms as "resident" and "legitimate business purposes" are of limited, if any, assistance. "[T]o give the specific words of a treaty a meaning consistent with the genuine shared expectations of the contracting parties, it is necessary to examine not only the language, but the entire context of agreement." Maximov v. United States, 2 Cir., 1962, 299 F.2d 565, 568, aff'd, 373 U.S. 49, 83 S.Ct. 1054, 10 L.Ed. 2d 184 (1963).

■ The primary objective of our treaty with Switzerland, as well as of those with more than twenty other countries, is the elimination of impediments to international commerce resulting from the double taxation of international transactions. The basic mechanism of these treaty arrangements is the establishment of standards for determining the single most appropriate locus for the taxation of any given transaction. Although some treaty provisions are inevitably the results of political compromise, the dominant criterion for determining the appropriate taxing locus is economic impact. Thus, as a general rule, the income from services is taxable

---

3. In addition to the determination of the Swiss tax authorities noted above, Johansson relies on the issuance of a temporary residence permit by Swiss authorities. While the record shows that transients need not apply for such permits (R., p. 951), there is no showing that a transient, claiming to be a resident, would be denied one.

4. It appears that the contract with "Scanart" was entered into two weeks before Scanart was formally organized. R., pp. 113, 447.

where the services are rendered. See Smith, The Functions of Tax Treaties, 12 Nat'l Tax J. 317, 320 (1959). Where, as here, services are performed in the United States and the compensation for them is drawn from the wealth of the United States, this is the country of primary economic impact and, consequently, the appropriate taxing locus.

There are, however, a number of prudential exceptions to the general "economic impact" rule. Among these is the view that a business enterprise engaged in international commerce ought not to be subject to taxation in every country in which it may transact some business. Although such an enterprise does draw upon the wealth of all the various countries with which it comes into contact, the over-all objective of encouraging international commerce, as well as the practical necessities of business planning, are better satisfied by a centralized regime of taxation at the enterprise's "business seat" or "permanent establishment." The "business seat" exception is found in article III of the Swiss treaty.

 Elements of this exception are also found in article X. Typical of what have become known as "commercial traveler provisions" in international tax conventions, the article is designed to assure business establishments in each of the contracting states that they may freely send their agents and employees into the other contracting state without thereby subjecting those employees to the latter's taxes. Like article III, it is an exception to the "economic impact" rule carved out in the interest of facilitating international trade. Where the practical reasons for the exception do not obtain, however, the general rule must apply. Thus, while Johansson may have brought himself within the words of the Swiss treaty by his "residence" in Switzerland and his "employment" by a "Swiss corporation," he has failed to establish any substantial reasons for deviating from the treaty's basic rule that income from services is taxable where the services were rendered. International trade will not be seriously encumbered by our refusal to grant special tax treatment to one only marginally, if at all, a Swiss resident and only technically, if at all, employed by a paper Swiss corporation. Therefore we affirm the district court's judgment that Johansson is liable for the taxes assessed against him in 1960 and 1961.

 It now becomes necessary to consider the question whether the district court erred in refusing to allow the setoffs of $287,750.60 requested by the appellants-lienees. The lienees contend that the judgment refusing these setoffs was erroneous because the setoff question was not properly an issue before the trial court. We are unable to agree with this contention. The Government's amended complaint prays for the foreclosure of tax liens on "the monies now held by the defendants * * * or which in the future will come into their possession, and which are to be paid for the appearance of Ingemar Johansson in * * * [the third Patterson fight]." (R., pp. 23, 33.) And the answer filed by Feature Sports alleges "as and for an offset" that it made certain payments to Scanart for Johansson free and clear of any valid assessment or lien. (R. 62–63). That these pleadings were considered as raising the issues to be tried in the case was expressly acknowledged in the parties' pre-trial stipulation. (R., p. 98.) That stipulation also specifically referred to a number of exhibits which bear on no other issue in the case except that of setoff. (Govt. exhs. 5, 15, 17, 18 and 133–E.) All these exhibits were admitted without objection. Moreover, testimony relevant to the setoff issue was elicited from appellants Cohn, Bolan, and Johansson and from William Fugazy, a member of the board of appellant Feature Sports. (R., pp. 250–53, 259–60, 280–93, 297–99, 301–03, 305, 483–85, and 265–73.)

 We are also unable to agree with the appellants that the trial court erred in refusing to allow them to set off $37,750.60 paid to various persons for services in connection with the second and third Patterson fights. To allow a

setoff for that part of the $37,750.60 attributable to the second fight would be in violation of the agreement made by all the parties to this suit and the Franklin National Bank in 1960. Under that agreement, all funds received by appellants in connection with the second fight, with certain exceptions not material here, were to be deposited in the bank to secure the full collection of the taxes due on Johansson's 1960 United States income. (R., pp. 41–49.) Insofar as the expenditures in question may be deductible from Johansson's compensation for the third fight, moveover, they could only be deducted after such compensation was earned. As the income was not earned until after the tax liens attached, and as the expenditures sought to be deducted were made to unsecured creditors, a setoff of these expenditures would undermine the recognized priority of the liens.

In addition to the setoffs discussed in the preceding paragraph, the district court refused to allow a setoff in the amount of $250,000 which was transferred to Johansson following the third Patterson fight by the Bank Germann in Basel, Switzerland. On the present state of the record, we are unable to affirm this part of the judgment. The $250,000 was transferred to the Bank Germann by Feature Sports in three installments, all prior to the date the Government's tax lien attached, and was intended as an advance on the compensation which Johansson was to receive from the third fight. Appellants contend that the transfers were in escrow and that the funds were therefore not property of the taxpayer in their possession to which the Government's lien could attach. The Government, on the other hand, contends that a valid escrow arrangement was not perfected. The findings of the district court on this issue are ambiguous. Although the court's conclusions of law and judgment clearly favor the Government, in its findings of fact it twice denominated the Bank Ger-

mann as Feature Sports' "escrow agent." (Finding #34, R., p. 202.)

 If the district court intended to find as a fact that there was a valid escrow arrangement with the Bank Germann, such a finding would be supportable by the record. The essential elements of a valid escrow arrangement are a contract between the grantor and the grantee agreeing to the conditions of a deposit, delivery of the deposited item to a third party, and communication of the agreed upon conditions to the third party. See Lechner v. Halling, 35 Wash. 2d 903, 216 P.2d 179, 185; Annot., 130 Am.State Rep. 910, et seq. In this case the only element about which there is any question is the contract between grantor (Feature Sports) and grantee (Scanart or Johansson). There is in the record a written agreement, dated April 4, 1960, providing for the advance of certain funds from Feature Sports to Scanart through the Bank Germann as escrow agent but this relates only to the second Patterson fight. (Govt. exh. 26.) However, appellant Bolan testified that there was an oral agreement between Feature Sports and Johansson to the effect that they would conduct their affairs in connection with the third fight under the same terms as those contained in the April 4, 1960 contract. (R., pp. 292, 298.) In addition, memoranda purporting to confirm and somewhat modify the earlier oral agreement are in evidence.[5] (Govt. exhs. 5, 17, 18.) If the court believed Bolan's testimony, it was entitled to find that a contract was in existence which would support the creation of a valid escrow of $250,000.

 If a valid escrow arrangement was in effect prior to the time the Government's tax lien attached, Feature Sports could not have prevented the transfer of $250,000 to Johansson following the third fight. See Farago v. Burke, 262 N.Y. 229, 233, 186 N.E. 683, 684 (1933); Tucker v. Dr. P. Phillips Co.,

5. An undated document purporting to be a nearly contemporaneous memorandum of the oral escrow contract is printed in Feature Sports' brief at p. 18 but is not in evidence in this suit.

5 Cir., 1943, 139 F.2d 601, 602. Having advanced $250,000 to Johansson under the escrow arrangement, Feature Sports would be entitled to retain that amount out of the income it received representing Johansson's share of the proceeds of the third fight. This amount would be, in effect, the result of an assignment of part of Johansson's income to Feature Sports made for valuable consideration. "When income has been assignd to an independent party for value, the courts have not allowed a lien on that property in the hands of the assignee even though the income is taxable to the grantor or assignor." Note, "Property Subject to the Federal Tax Lien," 77 Harv.L.Rev. 1485, 1502. See United States v. Long Island Drug Co., 2 Cir., 1940, 115 F.2d 983; Plumb, Federal Tax Collection and Lien Problems, 13 Tax L.Rev. 247, 255 & n. 56. Although there is no formal assignment in evidence, the relevant consideration in determining the applicability of the foregoing principle is the question whether Feature Sports would have an enforceable right to the funds, which right vested prior to the tax liens. United States v. Chapman, 10 Cir., 1960, 281 F.2d 862, 866, and n. 10. Applying this principle to the facts of this case, the Government's lien may not reach the $250,000 claimed by Feature Sports to have been paid in escrow for Johansson only if a valid escrow arrangement was perfected. And such an arrangement was perfected only if there existed, prior to the deposit of any funds [6] in the Bank Germann, a contract between Feature Sports and Johansson or Scanart specifying the terms and conditions of the contemplated delivery in escrow.

Although the district court referred to the Bank Germann as Feature Sports' "escrow agent," we are unable to say with certainty that that court made the finding necessary to a ruling in favor of the appellants on this issue. Therefore, we remand the case to the district court to make a finding of fact, based on the present record, on the following question:

Whether, prior to the initial deposit of advances for Johansson in the Bank Germann, there existed a contract between Feature Sports and Johansson and/or Scanart, S.A., providing for the delivery of advances into an escrow account to be paid out upon the participation of Johansson in the third Patterson fight.

If the court finds there was such a contract, it must amend its previous judgment to permit the $250,000 setoff requested by Feature Sports. If it finds there was no such contract, its original judgment and order must stand.

One final matter remains to be dealt with. The individual appellants Cohn, Bolan and Fugazy filed a separate brief asking that part of the district court's decree be modified to make it clear that no individual liability on their part, other than any which may arise from their connection with Feature Sports, Inc., was intended to attach. In place of the words, "Ordered, Adjudged, and Decreed that the defendant Feature Sports, Inc., and its officers * * * [naming the three] render an accounting * * * and turn over * * * the funds it holds * * * [as compensation to Johansson for the Patterson fights]," they would substitute "Ordered, Adjudged and Decreed that the defendant Feature Sports, Inc., *through its proper officers*, render an accounting" etc.

We fully agree with the appellants Cohn, Bolan and Fugazy "that the only obligation or responsibility imposed upon them by * * * [the] judgment is that which might flow as a result of their connection with the corporation Feature Sports, Inc." Supplemental Brief on

---

6. Because the contract, as represented on the present record, must be taken as being unseverable, it is essential that no part of the escrowed funds have been deposited before the alleged contract was made. Thus, even though $150,000 was deposited after the execution of the memorandum dated December 23, 1960, which refers to the prior oral agreement, appellants cannot lay claim to a minimum setoff in that amount.

Behalf of Appellants, Thomas Bolan, Roy Cohn and Humbert Fugazy, p. 4. But, although we recognize the slight ambiguity in the decree, it does not appear to us to be so incapable of proper understanding as to require a linguistic modification. Moreover, we are hesitant to make such a modification lest, on some set of facts as yet unknown, our action might be construed as changing not merely the wording but the substance of the decree as well.

For the reasons stated, the judgment is affirmed in part and remanded to the district court in part for the purpose of allowing that court to make a finding on the question specified herein, and either to modify or let stand its original decree in accordance with the ruling of this court.

Affirmed in part and remanded in part.