Floyd Patterson and Sandra Patterson v. Commissioner. Floyd Patterson Enterprises, Ltd. v. Commissioner.
Patterson v. Commissioner
Docket Nos. 4639-64, 4640-64.
United States Tax Court
T.C. Memo 1966-239; 1966 Tax Ct. Memo LEXIS 44; 25 T.C.M. (CCH) 1230; T.C.M. (RIA) 66239; October 26, 1966
*44 Petitioner Floyd Patterson and Constantine D'Amato incorporated petitioner Floyd Patterson Enterprises, Ltd. for the purpose of exploiting the ancillary rights from Floyd's boxing matches. Held, under the facts presented, Enterprises was not a separate taxable entity. Held, further, that there was no deficiency in 1958 Federal income tax due to failure to report an amount withheld to cover possible liabilities for California taxes. *45 Edwin Stephen Schweig and Julius November, 51 Chambers St., New York, N. Y., for the petitioners. Robert D. Whoriskey and Wallace Musoff, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in the income tax of Floyd and Sandra Patterson in the amounts of $17,436.57 for 1957 and $24,212.07 for 1958 and deficiencies in the income tax of Floyd Patterson Enterprises, Ltd. of $7,500.10 for the taxable year ended November 30, 1957 and $37,235.90 for the taxable year ended November 30, 1958. After settlement of certain issues raised by the deficiency notice, [1] there remain for our determination the following issues: (1) Whether Floyd Patterson Enterprises, Ltd. should be recognized as a separate entity for tax purposes in 1957 and 1958 or, alternatively, whether, if it is so recognized, its income should nevertheless be attributed to petitioner or, if not so attributed, whether it was nevertheless a personal holding company. Also involved is the question whether Floyd Patterson individually or Floyd Patterson Enterprises, Ltd. should have included in income certain receipts from exhibition matches *46 in 1958 not reported by either. (2) Whether $18,838.44, allegedly withheld from petitioners and representing income taxes claimed by the State of California, constituted taxable income in 1958 and, if so, to which of the petitioners. Findings of Fact Some of the facts have been stipulated and are found accordingly. Floyd and Sandra Patterson were husband and wife and filed joint Federal income tax returns on a cash basis for 1957 and 1958 with the district director of internal revenue, Manhattan District, New York. Sandra is a party to these proceedings solely by reason of having filed a joint return with Floyd. Any reference to "petitioner" shall be to Floyd. Floyd Patterson Enterprises, *47 Ltd. (herein referred to as the "Corporation") was incorporated under the laws of the State of New York on April 27, 1956. The Corporation filed returns on the cash basis for the fiscal years ended November 30, 1957 and November 30, 1958 with the district director of internal revenue, Manhattan District, New York. The Corporation was authorized to issue capital stock in the amount of $20,000 consisting of 200 shares with a par value of $100 each. Ten shares were issued to petitioner and five shares were issued to Constantine D'Amato (herein referred to as "D'Amato") on April 27, 1956. These 15 shares represent all of the issued and outstanding stock of the Corporation during the taxable years. At no time prior to December 31, 1958 had the Corporation received payment for the stock, the amount of $1,000 being carried on its records as due from stock subscriptions. [2]
On November 30, 1956, petitioner became the heavyweight boxing champion of the world by defeating *48 Archie Moore and remained the champion throughout the taxable years. On July 5, 1957, petitioner and D'Amato entered into an agreement, which was approved by the New York State Athletic Commission on July 18, 1957, whereby petitioner agreed to render services exclusively for D'Amato in such boxing contests and exhibitions as D'Amato would direct for a period of four years. After expenses, petitioner was to get 66 2/3 percent and D'Amato 33 1/3 percent of the money retained. Petitioner was guaranteed at least $600 in each year. The following paragraph was made a part of the agreement: TENTH: The Manager and the Athlete both certify and warrant to each other and to the said Commission, to induce its approval hereof, that no other person or party in any way or in any degree shares or participates in the ring earnings of the Athlete or in the Manager's or Athlete's portion of such earnings and that no oral or written agreement exists concerning such sharing or participation. D'Amato and petitioner were at all times the sole stockholders of the Corporation. The directors were D'Amato, petitioner, and Julius November. The Corporation was formed for the purpose of handling ancillary *49 rights. Ancillary rights in connection with boxing matches are all rights other than gate receipts and include television, radio, and movie rights. Edwin Stephen Schweig and Julius November, who were law partners, represented both petitioner and the Corporation and handled most of the details relating to petitioner's matches. On July 29, 1957, petitioner defended his heavyweight title successfully at the Polo Grounds in New York City against Thomas "Hurricane" Jackson. The agreement for the match was executed on May 24, 1957 by Eastern Parkway Fights, Inc., the promoter, and D'Amato, as petitioner's manager, and contained the following provisions: (f) The compensation to be received by Boxer shall be 40% of the gross receipts derived from the sale of tickets and admission and any other income received from television rights, radio rights or any other fringe benefits resulting therefrom less the federal, state and/or city admission taxes and any tax chargeable directly by governmental divisions against the receipts from said television rights or radio rights or such other fringe benefits; and less compensation paid for ring officials as required by the New York State Athletic Commission. *50 Promoter guarantees that the minimum sum that Boxer shall receive as his compensation shall be the sum of $175,000.00. (g) The sum to be deposited by the Boxer as forfeit money shall be the sum of $5,000.00, as and if required by the New York State Athletic Commission. Promoter guarantees that the television rights will be sold for at least $175,000.00. Television rights shall be all inclusive and shall include but shall not be limited to such rights as theater television, network television, pay-as-you-go and subscription television, and the decision for the sale of such rights shall be solely that of the Promoter, subject, however, that the sale of any such television rights shall call for a blackout of the New York area of the usual radius of 100 miles. The Promoter agrees to advance the sum of $5,000.00 to the Boxer on or before May 28, 1957 which sum shall be deducted from the proceeds to be received by the Boxer under this contract. Petitioner settled for and received $119,890.78 as his share of the net receipts, which included the proceeds of gate receipts and the sale of television rights to National Broadcasting Company. The Corporation reported no income from the *51 Patterson-Jackson match. On August 22, 1957, petitioner successfully defended his title against Thomas P. Rademacher at the University of Washington Stadium, Seattle, Washington. The agreement for the match was executed on June 4, 1957 by D'Amato, signing for himself and as petitioner's manager, Jack Hurley, the promoter, Rademacher, and Melchoir C. Jennings, Rademacher's manager. The agreement contained the following: (c) It is understood that PATTERSON is to receive forty (40%) percent of all of the gross receipts less a credit of the guaranteed amount of Two hundred and fifty thousand ($250,000.00) dollars whichever is greater. The gross receipts shall be such as may be derived from the sale of tickets of admission and any other income received from television rights, moving pictures, radio right or any other fringe benefits resulting therefrom, (less the Federal, state and/or City admission taxes and any tax chargeable directly by governmental divisions against receipts from television rights or radio rights or other fringe benefits. By mutual agreement of the parties, petitioner received only $175,000 from the match rather than the guaranteed $250,000. In connection with *52 the Patterson-Rademacher match, an offer from Hanover Pictures Corp. was accepted by Schweig, ostensibly on behalf of the Corporation, whereby Hanover Pictures Corp. would make prints of the original motion picture of the match and distribute them on a rental basis subject to the Corporation's approval, with the Corporation sharing in the profits. [3] On September 3, 1957, the Corporation through Schweig acknowledged an alleged obligation to pay one-third of its share of profits to Jennings. [4]
The Corporation's gross profit for the taxable year ended November 30, 1957 was computed as follows: Gross Receipts
Appearances of Floyd on
Steve Allen and Ed Sulli-
van shows
$ 5,500.00
Other radio and television
shows
12,692.50
Gross receipts from Pat-
terson-Rademacher fight
motion pictures
16,999.16
$35,191.66
Cost of Operations
Expenses of Patterson-Rademacher
motion pictures
17,824.91
Gross profit
$17,366.75
*53 The contract for petitioner's appearances on the Ed Sullivan television show was executed by Ed Sullivan and D'Amato. The Corporation was not a party thereto, nor did it enter into any other contracts in 1957 for petitioner's personal appearances. On August 18, 1958, petitioner successfully defended his title against Roy Harris at Wrigley Field, Los Angeles, California. The agreement for the match, dated June 24, 1958, was signed by D'Amato, as petitioner's manager, and by Hollywood Post 43, American Legion, and William P. Rosensohn, as promoters. Petitioner was to receive 50 percent of the gross receipts, less "state and government taxes," and 7 1/2 percent of the gross receipts which was to be paid to the American Legion. Harris was to receive the sum of $100,000 as consideration for all his rights for participating in the match, to be paid before petitioner received any proceeds from the match. There was no mention of the Corporation anywhere in the agreement. At no time prior to December 31, 1958 did petitioner assign any rights, ancillary or otherwise, in or to any matches or other appearances from which receipts were derived during the taxable years involved herein. [5] *54 On June 30, 1958, a contract was entered into between TelePrompTer Corporation (hereafter referred to as "TPT") and the Corporation, wherein the Corporation purported to sell to TPT all radio, television, and motion picture rights to the Patterson-Harris match. The Corporation agreed to provide a suitable location at the site of the match for TPT to conduct its activities. TPT assumed the obligation of paying Harris his guaranteed $100,000. The Corporation assumed no financial risks in connection with the match. The Corporation on its fiscal 1958 return reported $50,973.51 as its share of the proceeds from the agreement with TPT and $37,500 as its share of the proceeds from the sale of admission tickets *55 to the match and petitioner on his 1958 return reported two-thirds of these amounts. [6]
All receipts from the Patterson-Harris match were deposited in the corporate bank account in August 1958 and, except for a nominal amount, were distributed shortly thereafter to petitioner and D'Amato or were used to cover expenses of the match. Some expenses of the match were deducted by petitioner on his individual tax return with no allocation to the Corporation. The Corporation's gross profit for the taxable year ended November 30, 1958 was computed as follows: Patterson-Harris fight
Joint venture
$64,858.61
Other income: London, England, exhibition tour
by petitioner
7,500.00
British Broadcasting Co.
40.40
Telephone refunds
169.44
Gross profit
$72,568.45
Petitioner and the Corporation maintained the following bank accounts during the years involved herein: 1. Petitioner's individual checking account with the Manufacturers Trust *56 Company until September 1957. 2. Petitioner's individual checking account with the Chemical Corn Exchange Bank (also known as Chemical Bank New York Trust Co.), September 1957 to December 1958. 3. Corporation's checking account with the Chemical Corn Exchange Bank during the years 1957 and 1958. 4. Checking account entitled "Edwin Stephen Schweig, Special #3" with the Chemical Corn Exchange Bank during the years 1957 and 1958. 5. Account entitled "Edwin Stephen Schweig, Special #4," later called the Patterson-D'Amato fund, with the Chemical Corn Exchange Bank during the years 1957 and 1958. The account entitled "Edwin Stephen Schweig, Special #3" was an escrow account containing personal funds of petitioner. The Patterson-D'Amato fund account was an escrow account containing funds allocated to petitioner and D'Amato. Money frequently changed hands between petitioner and D'Amato, on the one hand, and the Corporation, on the other (and their respective bank accounts), ostensibly without any accounting. Some of the receipts reported on the Corporation's returns were not deposited in the Corporation's bank account but found their way into the hands of petitioner and D'Amato. *57 For example, the proceeds from petitioner's exhibition tour in England in 1958 were deposited in petitioner's and D'Amato's personal checking account; petitioner deducted the expenses related thereto on his individual return. The sum of $18,838.44 was withheld in California to cover possible additional taxes which the State Franchise Tax Board asserted to be due to California from the proceeds of the match. The Board deemed it to be "Tax Withheld at Source from Earnings of Floyd Patterson." The promoter's computation of petitioner's share of the proceeds of the match included the $18,838.44 and he listed it as payable to petitioner on a balance sheet he prepared pertaining to the match on October 23, 1958. Neither petitioner nor the Corporation included it in their respective returns. Expenses pertaining to the Philadelphia and Houston exhibitions were deducted on petitioner's 1958 individual return. In December 1958 the amount of $1,153.42 was received from the London, England, promoter as a "refund on the European trip" and $4,669.17 was received from exhibitions in Houston, Philadelphia, and London, but these amounts were not included either in the Corporation's return or *58 petitioner's return. The total of these items is $5,822.59. During the taxable years, the Corporation shared a one-room office with petitioner in New York, had its name on the door, and had a listing for its phone number. The Corporation did not own any of the furniture or equipment in its office. The only books and records maintained by the Corporation were work sheets labelled cash receipts and disbursements for the fiscal year ended November 30, 1958 and two folders with miscellaneous papers and work sheets for the fiscal years ended November 30, 1957 and November 30, 1958. It had a stock transfer ledger, a stock certificate book, minutes, and bylaws. The Corporation's minutes reflected only the usual meetings held at the time of the formation of the corporation. There were no minutes of any subsequent meetings of the board of directors nor, except for the meeting on June 18, 1958, any such meetings of stockholders. The Corporation deducted $25,000 paid to petitioner and $10,000 paid to D'Amato as salaries on its fiscal 1958 return. It also claimed that it had one other employee. [7] Petitioner reported the $25,000 so received on his 1958 return. *59 The Corporation took no actions other than as set forth above. It never declared or paid any dividend as such. Opinion The first issue with which we are concerned is whether the amounts of $10,860.01 and $44,225.05 received in 1957 and 1958, and claimed by the Corporation as taxable to it, are property taxable to petitioner. [8]
Respondent asserts that the Corporation should not be recognized for tax purposes and therefore petitioner should be charged with the income. Alternatively, he argues that petitioner should be taxed on the theory of assignment of earned income or on the basis of an allocation under section 482. [9] If we should not agree with respondent as to any of the foregoing alternatives, he asserts that the Corporation was a personal holding company and should therefore be taxed under section 541. Petitioners, on the other hand, claim that the Corporation was a viable entity for tax purposes, that it, and not petitioner, *60 earned the income, and that, therefore, any attempt on the part of respondent to allocate its income to petitioner is clearly erroneous. Further, petitioner asserts that the Corporation was not a personal holding company. While it is true that a taxpayer is free to adopt the corporate form of doing business, a corporation must perform some meaningful business function in order to gain recognition as a separate entity for tax purposes. National Investors Corporation v. Hoey, 144 F. 2d 466 (C.A. 2, 1944). See also Gregory v. Helvering, 293 U.S. 465 (1935), and Johansson v. United States, 336 F. 2d 809 (C.A. 5, 1964). Concededly, the Corporation was formed with the "business" purpose of exploiting the ancillary rights pertaining to petitioner's boxing matches. Petitioners claim that the Corporation did in fact carry out the intended purpose. This is where there is a short fall in their position. Petitioners have presented their case on the theory of what might have been rather that what was. Under the proper circumstances, a corporation may well perform a legitimate function in exploiting ancillary rights such as are involved herein. Cf. *61 Commissioner v. Laughton, 113 F. 2d 103 (C.A. 9, 1940), remanding 40 B.T.A. 101 (1939); Fontaine Fox, 37 B.T.A. 271 (1938). But in such a case it is not enough that the corporation be recognized as a separate entity as a matter of local law governing corporations. For tax purposes, it must be given substance through the manner in which it actually operates. This was not done here. Petitioners simply did not put flesh on the bones of the corporate skeleton. Indeed, the bones are so transparent that the Corporation should more properly be classified as a wraith. It would serve no useful purpose for us to detail all of the factors which have led us to this conclusion. They are elaborated upon in our findings of fact. We think it sufficient to note the following: (1) The record is devoid of any evidence that the Corporation either obtained any rights or performed any functions with respect to petitioner's personal appearances on radio or television or by way of exhibition tours. [10]
*62 (2) Although the Corporation's ostensible purpose was to exploit all ancillary rights to Patterson's fights, it played no part and claimed no interest in the television rights in the Patterson-Jackson match granted to the National Broadcasting Company. [11]
(3) With respect to receipts from the motion pictures of the Patterson-Rademacher match, it is true that the Corporation was a named party to the contract with Hanover Pictures Corp. but there is no evidence that the rights were transferred by petitioner to the Corporation. [12] Even assuming that such rights constitute severable property, capable of being dealt with independently (an issue which we do not decide), cf. Rev. Rul. 54-409, 1954-2 C.B. 174, we are *63 not convinced that the Corporation, through Schweig, participated in a meaningful manner in the approval of the exhibition agreements by Hanover Pictures Corp. (4) As far as the Patterson-Harris match is concerned, the ancillary rights thereto originally inured to the petitioner, they were not assigned by him to the Corporation. Here again, the Corporation rendered no meaningful services; it was nothing more than a passive - and temporary - depositee of the monies. [13] Cf. Johansson v. United States, supra.The $100,000 guaranty to Harris was secured by funds provided *64 by TPT. The Corporation neither incurred nor discharged any obligation in this regard and, indeed, was not in a financial position to do so. We also note that, although the contract signed in the name of the Corporation with TPT provided for approval of exhibitors by the Corporation, the record is devoid of any testimony as to whether the Corporation performed any functions in this regard. (5) Although receipits from certain activities were reported by the Corporation, expenses relating to such activities were deducted by petitioner on his individual returns. (6) Receipts from certain activities reported by the Corporation found their way into the hands of petitioner and D'Amato and some receipts reported by petitioner (and presumably D'Amato) were deposited in the Corporation's bank account. (7) Large amounts of receipts deposited in *65 the Corporation's bank account were shortly thereafter paid out to petitioner and D'Amato. (8) While failure to maintain complete corporate records and books of account is not necessarily a critical factor, the Corporation did not even observe the minimum requirements in this regard. (9) There is no convincing evidence that the Corporation had any employees or, if it had any, what services they performed for it. [14]
We hold that the Corporation merely served as an instrument by which income and expenses could be arbitrarily allocated to serve the tax interests of petitioner and D'Amato and therefore should not be recognized for income tax purposes during the years involved herein. [15]Fontaine Fox, supra, relied upon by petitioner, is clearly distinguishable. In that case the necessary steps were meticulously taken to put flesh on the bones of the corporate skeleton. *66 In view of this holding, we need not consider the alternative theories advanced by respondent. The second issue with which we are concerned deals with the $18,838.44 that was withheld to cover possible liabilities on petitioner, D'Amato, and the Corporation for California franchise and income taxes. Respondent allocated two-thirds to petitioner and one-third to D'Amato, or, alternatively, one-half to the Corporation, one-third to petitioner, and one-sixth to D'Amato. The record reveals only that the amount in question was not paid to petitioner, D'Amato, or the Corporation in 1958 and that it was subject to a claim for income and franchise taxes by the California taxing authorities. Whether it was in fact paid to the taxing authorities or merely withheld by the promoter subject to the state's claim is not disclosed. Both petitioner and the Corporation were on a cash basis. The promoter was simply their debtor, and not their agent so that receipts in his hands could be said to be set aside or earmarked to such an extent as constructively *67 to belong to them. Cf. Ray S. Robinson, 44 T.C. 20 (1965). Even if this were not the case and petitioner and the Corporation could be held to have realized income, we think that there would be a counterbalancing payment of deductible taxes either by a transfer of the funds directly to the state or a retention of the funds by the promoter as a withholding agent for the state. Cf. Estate of Aaron Lowenstein, 12 T.C. 694 (1949), affirmed on other grounds, 183 F. 2d 172 (C.A. 5, 1950); Lillian Bacon Glassell, 12 T.C. 232 (1949). Under either theory no net taxable income is involved. [16] We hold that neither the Corporation nor petitioner should be taxable in 1958 on any portion of the $18,838.44. [17]
The final *68 issue is whether petitioner understated his income in his 1958 return by $3,881.74 (two-thirds of $5,822.59), which represents income from his Houston, Philadelphia, and London exhibition matches and "Refunds of London, England personal expenses." Apparently, petitioners do not question respondent's determination as to amounts but assert that the Corporation, rather than petitioner, should have included these amounts in income. Our holding as to the first issue in this case disposes of petitioner's contention. We hold that petitioner should have included the $3,881.74 in his 1958 return. Decisions will be entered under Rule 50. Footnotes
1. It is not clear whether the settlement included an item of $249.10 claimed as an office expense by Floyd Patterson Enterprises, Ltd. for the taxable year ending November 30, 1958 which was disallowed by respondent. We assume that either the item was so included or, since no evidence was presented at trial, the issue has been abandoned by petitioners. There are no relevant differences between the parties due to different taxable years of the individual and corporate petitioners.↩
2. Counsel for petitioners assert that $1,000 rather than $1,500 - which would have been the proper amount for 15 shares at $100 per share - was carried on the books due to an error of the Corporation's accountant.↩
3. After expenses, the Corporation was to receive 65 percent of the proceeds, which amounted to $16,999.16. The Corporation on its return for the year ended November 30, 1957 claimed expenses of $17,824.91 from exhibition of the films. ↩
4. The September 3 letter refers to an agreement between Jennings and the Corporation respecting the film but no document reflecting any such agreement was offered in evidence. We note that the only other agreement in evidence respecting the Patterson-Rademacher match was the agreement of June 4, 1957 to which the Corporation was not a party.↩
5. The minutes of a special meeting of the stockholders held on June 18, 1958 discuss the ancillary rights to the Patterson-Harris fight and the purported activities of the Corporation in connection therewith. Patterson signed these minutes as chairman of the meeting. Petitioners do not argue that this was sufficient to constitute an assignment of the ancillary rights to the Corporation and, in any event, we hold that it is too slender a reed upon which to peg any such finding.↩
6. At the June 18, 1958 stockholders' meeting, it was agreed that the receipts emanating from the Patterson-Harris match would be divided equally between the Corporation on the one hand and petitioner and D'Amato on the other.↩
7. There is conflicting evidence whether petitioner's mother-in-law, Mrs. Hicks, was an employee of the Corporation or of Edwin Stephen Schweig, accountant and attorney of both petitioner and the Corporation. The Corporation's disbursement records indicate that she was paid weekly by the Corporation, but no evidence has been presented as to what services she performed and for whom they were performed.↩
8. Respondent attributed only two-thirds of the Corporation's reported income to petitioner, the remaining one-third being attributed to D'Amato in accordance with their agreement.↩
9. All references are to the Internal Revenue Code of 1954.↩
10. The only contract in the record respecting these activities is for the Ed Sullivan Show executed by D'Amato on behalf of petitioner with no mention of the Corporation.↩
11. The promoter's contracts covering the Jackson and Rademacher matches, executed on behalf of petitioner individually, refer to radio and motion picture rights and other fringe benefits, but we are unable to determine from the record herein whether, aside from the motion picture rights in the Rademacher match, such rights or benefits were exploited or, if they were so exploited, whether petitioner or the Corporation derived any receipts therefrom.↩
12. The acquiring of such rights by the Corporation might have been prohibited. In the agreement between petitioner and D'Amato it was stated that "to induce its [the Boxing Commission's] approval * * * no other person or party in any way or in any degree shares or participates in the ring earnings of the Athlete or in the Manager's or Athlete's portion of such earnings and that no oral or written agreement exists concerning such sharing or participation." We have not been enlightened as to whether the phrase "ring earnings" may have included receipts from the exploitation of ancillary rights.↩
13. The net receipts from the match were to be divided between petitioner and the Corporation on a 50-50 basis. However, petitioner did not allocate 50 percent of certain expenses he incurred in connection with the match and deducted on his 1958 return to the Corporation, which allocation would have been consistent with such an arrangement.↩
14. Late in 1958, the Corporation arbitrarily paid $25,000 to petitioner and $10,000 to D'Amato which it designated as salary on its tax returns. Also, the Corporation had paid some money weekly to Mrs. Gladys Hicks, petitioner's mother-in-law, but there is no evidence as to why she was paid.↩
15. The issue as to whether the Corporation may be entitled to refunds, as a result of this holding, is not before us. See section 1311 et seq.↩
16. Since petitioner claims no medical expenses and his charitable deductions were well within the statutory maximums, it makes no difference whether we hold that the item was not income or that it was income, but there was an offsetting deduction for state taxes. ↩
17. On respondent's theory and based upon our holding on the first issue herein, any net "refund" of this amount would presumably be taxable to petitioner.↩