Argued January 27, affirmed February 24, 1954

## MOORE MILL & LUMBER CO.
## *v.* CURRY COUNTY BANK ET AL. and THE
## UNITED STATES OF AMERICA

267 P. 2d 202

*Robert L. Dressler,* Assistant United States Attorney, of Portland, argued the cause for appellant. On

the briefs were Henry L. Hess, United States Attorney, and Donald W. McEwen and Maurice V. Engelgau, Assistant United States Attorneys, of Portland.

*Grant T. Anderson* of Portland argued the cause for respondent Moore Mill & Lumber Co. On the brief were King, Wood, Miller, Anderson & Nash and Eric R. Haessler, of Portland.

Before LATOURETTE, Chief Justice, and WARNER, LUSK, BRAND and PERRY, Justices.

WARNER, J.

This is a suit to determine the interest of the parties in a fund of $6,500 held by the Curry County Bank in Gold Beach, Oregon. The United States intervened, claiming ownership to be in Morrill Logging Company and a tax lien against that interest. From a decree in favor of the plaintiff Moore Mill & Lumber Co. and against the intervenor, the United States alone appeals.

The question of ownership interest in the fund is clouded by relatively complicated negotiations had between the plaintiff-respondent Moore Mill & Lumber Co., a corporation (hereinafter called Moore Mill) and the defendants, Guy H. Granger and A. A. Morrill, who were doing business as Morrill Logging Company (hereinafter called Morrill) and the antecedent transactions between Morrill and Double O Lumber Company, a corporation (hereinafter called Double O).

It appears that on or about January 12, 1948, Morrill contracted with Double O to log, cut and remove certain timber from lands owned by Double O in Curry county; but because of alleged defaults on the part of Morrill, notice of termination was given to Morrill on May 26,

1948. Notwithstanding, Morrill continued to remove timber from the interdicted premises of Double O.

While the relations between Morrill and Double O were in this status, Morrill, early in June 1948, began negotiations for the sale and immediate delivery of one million feet of Douglas fir logs to Moore Mill. As a part of these negotiations, Moore Mill on June 3, 1948, made an advance of $500 against the logs to be delivered and on June 9 made a further advance by a check for $6,500 for the same purpose. On the same date Morrill obtained a certified check from the Coquille branch of the First National Bank of Portland, payable in like amount of $6,500 to the Curry County Bank. Later in the day this was delivered to the latter bank by the late Collier H. Buffington, then Morrill's attorney and agent, together with a letter of instructions. The Curry County Bank thereupon acknowledged receipt of the letter and check, which it cashed, pursuant to the directions contained in the letter, and deposited in its escrow account.

On June 16, 1948, Moore Mill received a letter from Double O's counsel notifying it that the contract between Morrill and Double O had been terminated and that Double O would look to Moore Mill for the value of all stumpage from the Double O property received by Moore Mill from Morrill. This news interrupted the completion of the impending purchase arrangement between Moore Mill and Morrill, the former refusing to proceed without assurance of protection against liability to Double O. It eventuated the two transactions to which we now refer: first, on June 24, 1948, an amendatory letter of instructions to the bank concerning the disbursement of the funds it received on June 9; and, second, the execution of a written con-

tract between Moore Mill and Morrill relative to the purchase and sale of the logs. Subsequent to these later arrangements, Morrill on or about November 23, 1948, completed delivery of the logs called for by the contract with Moore Mill.

Apparently, although the details are not disclosed, Double O and Moore Mill at some time prior to the bringing of the case at bar effected a mutually satisfactory arrangement whereby Moore Mill in April 1950 waived the provision of the letter of June 9, 1948, mandating delivery of a title certificate by Double O as a condition precedent to delivery of the $6,500 deposit and directed the bank to pay that amount to Double O. It was the bank's refusal to do so that precipitated the filing of this suit.

We now give attention to the claim of the government. It appears that during the years 1947, 1948 and 1949 Morrill had failed to make payment to the collector of internal revenue for the amounts of withholding taxes and other taxes which Morrill had retained from the wages of its employees during those years. This resulted in 20 separate assessments being made. The first was on February 14, 1949 (substantially eight months following the Moore Mill-Morrill-Curry County Bank transactions above referred to). Together with penalties and interest, these assessments totaled $6,645.05. The government claims a lien for that amount against the $6,500, from and after the date the collector of internal revenue for Oregon received the list of such assessments. This is predicated upon the theory that the monies in the Curry County Bank are the property of Morrill.

We have already alluded to the letters addressed to the bank concerning the $6,500 deposited with it. The

first of these letters was dated June 9, 1948, and reads (omitting formal parts):

"Upon behalf of Morrill Logging Company, I hand you herewith a certified check of the said company drawn upon the Coquille Branch of the First National Bank of Portland payable to your order in the amount of $6,500.00.

"You are authorized and instructed to cash the said check and to hold the proceeds thereof. You are instructed to pay over the proceeds of the said check, that is, the amount of $6,500.00 to Double O Lumber Company as soon as the said Double O Lumber Company shall deliver to you a written statement signed by Commonwealth Incorporated, or by any other title insurance company authorized to transact business in the state of Oregon, certifying that the said Double O Lumber Company has marketable title or a title insurable without exceptions or defects other than the usual exceptions printed in title insurance policies in common use in the state of Oregon, in and to the real property particularly described as follows, to-wit * * *."

The second letter, dated June 24, 1948, reads (omitting formal parts):

"Under date of June 9, 1948, I handed you a certified check in the amount of $6,500.00 with a letter of instructions, a copy of which is hereunto annexed. This money still remains in your hands.

"Certain claims and representations have been made to Moore Mill & Lumber Company of Bandon, Oregon concerning the timber standing upon or logged from the land in this county particularly described in the said letter of June 9th, and certain claims and representations have been made to Moore Mill & Lumber Company concerning the stumpage payable for the said timber.

"Therefore, at the request and for the protection of Moore Mill & Lumber Company, and acting upon behalf of Morrill Logging Company, I hereby

instruct you further with reference to the said amount of $6500.00 that you are to hold the same in your hands and not to permit the same to be withdrawn unless Moore Mill & Lumber Company shall expressly, and in writing, authorize the disbursement or withdrawal of the said monies. All other conditions stated in my letter of June 9th shall remain in effect without change.

"I shall appreciate your signing two copies of this letter to each of which is attached a copy of my letter of June 9, 1948, as acknowledgement of your receipt of these instructions and also as acknowledgement that the said amount of $6500.00 mentioned in my letter of June 9th remains in your hands."

Both letters were signed by Mr. Buffington as attorney and agent for Morrill.

■ The rights of the government, when attempting to enforce a lien against the property or property rights of a delinquent taxpayer, arise no higher than the taxpayer had therein. *Karno-Smith Co. v. Mahoney* (CCA 3d 1940) 112 F2d 690, 692; *F. H. McGraw & Co. v. Sherman Plastering Co.* (DC 1943) 60 F Supp 504, 512 (affirmed 149 F2d 301, certiorari denied 326 US 753, 90 L ed 452, 66 S Ct 92); *New York Casualty Co. v. Zwerner* (DC 1944) 58 F Supp 473, 477; *United States v. Yates,* (Tex) 204 SW2d 399, 406.

■ A lien of the kind which the government here attempts to assert arises at the time the assessment list is received by the collector. 26 USCA § 3671. As we have noted, the first assessment list was received by the Oregon collector on February 14, 1949. Our inquiry is, therefore, focused on the discovery of what interest, if any, Morrill had in the funds held by the bank on that date, i.e., whether the funds are held as the *res* of a trust, escrow agreement or otherwise. If

it is found that Morrill had no interest therein as of February 14, 1949, then the government's claim of a lien against the $6,500 must fail.

The government contends that the transaction with the bank, as reflected by the letters of June 9 and 24, is more consistent with the theory of escrow than with the plaintiff's theory of trust. It was the holding of the circuit court that a trust was thereby established by the plaintiff Moore Mill for the benefit of Double O and for the protection of itself.

We think the evidence preponderates that as of June 9, 1948, the $6,500 tendered to the bank was the property of Morrill and not Moore Mill, notwithstanding that it had been advanced to Morrill by Moore Mill. We are also persuaded that the deposit made in the bank at that time did not create an escrow.

Historically, the term "escrow" was originally applied to instruments for the conveyance of land but has since been expanded to comprehend all written instruments so deposited. 19 Am Jur 419, Escrows § 3; 30 CJS 1193, Escrows § 3. In a few jurisdictions money deposited to be held until the performance of a condition has been treated as an escrow. 30 CJS 1193, Escrows § 3. However, because of our conclusion concerning the insufficiency of the instant transaction to create an escrow, it is not necessary for us to decide whether money so deposited can become the subject of an escrow arrangement. In discussing the legal effect of the letters from Morrill to the bank, we will assume without deciding that money is a proper item for an escrow.

Except as hereinafter noted, an escrow is, by its true nature and at the level of its minimum requirements, not less than a tripartite arrangement. It is

initiated in the first instance by a contract between two parties respecting the future delivery of an instrument upon the performance of some condition. The instrument is thereafter, by agreement of the parties to the contract, deposited with a third party, sometimes called the escrow agent. In essence, the deposit with the third party, with instructions concerning its ultimate delivery, is a new or additional agreement springing from and collateral to the original transaction.

The necessity for an agreement between the parties principally interested in creating the escrow arrangement is stated in 7 Thompson, Real Property perm ed, 663, § 4195, as follows:

"An 'escrow' is witnessed by a written instrument known as an 'escrow agreement,' *delivered by the mutual consent of the grantor and grantee* to a third party called a 'depositary' or 'escrow agent,' wherein certain conditions are imposed by either the grantor or grantee or both, which the depositary, by acceptance and retention of the escrow agreement, agrees to observe and obey. * * *" (Italics ours.)

*Davis v. Brigham,* 56 Or 41, 48, 107 P 961, Ann Cas 1912B 1340, evidences adherence to the same thought. There the court adopted from 11 Am & Eng Enc Law 2d ed, 335, the following definition of the character of contract that is essential to constitute an escrow:

"* * * 'In order that an instrument may operate as an escrow, not only must there be sufficient parties, a proper subject-matter, and a consideration, but the parties must have actually contracted. When the instrument purports to be a conveyance of land, for instance, the grantor must have sold, and the grantee must have purchased, the land. * * * The minds of the parties must

have met, the terms must have been agreed upon, and both must have assented to the instrument as a conveyance of the land, which the grantor would then have delivered and the grantee received, *except for the agreement then made that it be delivered to a third person,* to be kept until some specified condition be performed, and thereupon be delivered to the grantee by such third person.' \* \* \*'' (Italics ours.)

The same proposition finds echo and support in *McPherson v. Barbour,* 93 Or 509, 516, 183 P 752, where it is said:

"To constitute an escrow it is essential, *not only that the grantor and grantee are at one as to the conditions under which the deposit is to be made,* but that such conditions should be communicated to the depositary. And it is equally essential that the grantee or obligee is aware of every circumstance in connection with the conditions likely in any way to affect the liability under it: Note, 130 Am. St. Rep. 933. \* \* \* (Italics ours.)

Also see *Hansen v. Bellman,* 161 Or 373, 391, 88 P2d 295; *Foulkes v. Sengstacken,* 83 Or 118, 132, 158 P 952, 163 P. 311.

Above we noted an exception to the foregoing rule. In *Hansen v. Bellman,* supra, it is stated as follows, at p. 391: "\* \* \* There is, however, a class of cases where no contract exists, as where an instrument is deposited with a third person to be delivered to the beneficiary named therein upon the death of the depositor: 21 C.J. 866, § 2. \* \* \*'' Also see 30 CJS 1193, Escrows § 2.

■ It is evident to us that under the foregoing rules, the deposit made with the bank on June 9 was not an escrow arrangement, for the reason that it was not predicated upon a pre-existing agreement between

Morrill and Double O to liquidate all or any part of Morrill's indebtedness to Double O in this matter. Their mutual agreement of January 12, 1948, provided an entirely different method for the payment of stumpage cut on the lands of the latter. Moreover, there is no evidence that Double O concurred in the so-called escrow or had any knowledge of its existence. The fact that Mr. Buffington, as agent for Morrill, referred to it as an "escrow" or that the bank after cashing the check for $6,500 deposited it in its "escrow account" is not controlling as against its true character. *McPherson v. Barbour*, supra, at p. 516.

■ The claim of Moore Mill that the funds were the *res* of a trust is, in our opinion, an honest but erroneous afterthought. It is not necessary, however, to assign our reasons for this holding because of the legal character we hereinafter assign to the deposit.

■ Having concluded that the deposit created neither a trust nor an escrow, what then was the legal character of the deposit made by Morrill with the bank on June 9 and what, if any, interest did Morrill have therein afterward, up to and including the conference held on June 24? We are of the opinion that the facts warrant designating the fund as a specific deposit, sometimes erroneously referred to as a special deposit.

A specific deposit is described in 1 Morse, Banks and Banking 6th ed, 506, § 185, in the following words:

> "When money is deposited to pay a specified check drawn or to be drawn, or *for any purpose other than mere safe-keeping*, or entry on general account, it is a specific deposit, and the title remains in the depositor until the bank pays the person for whom it is intended, or promises to pay it to him.
>
> "* * * * *

"Where a check on a bank is deposited with the cashier, for which he gives a certificate of the receipt with the understanding that the amount, in money, is to be delivered to a third person when certain abstracts of title are received by the cashier from such third person, the deposit is specific and the bank is bound to pay in money although no actual money is deposited." (Italics ours.)

A special deposit is defined in 1 Morse, supra, p. 504, § 183, as follows:

"A Special Deposit is where the whole contract is that the thing deposited shall be safely kept, and that identical thing returned to the depositor."

To the same effect is 9 CJS 570, Banks and Banking § 275, reading:

"*  *  *  A specific deposit, or deposit for a specific purpose, consists in the delivery of money or property to a bank for application to a designated object or a defined purpose, as in the case of money deposited to meet a maturing obligation or a note delivered for collection. While such a deposit has been referred to as 'special,' and by other authority has been termed general in character, strictly speaking it is neither general nor wholly special, but constitutes a distinct class of deposits.

"A 'specific' deposit partakes of the nature of a 'special' deposit to the extent that title to the thing deposited remains in the depositor and does not pass to the bank, unless and until applied to the specified purpose, that no relation of debtor and creditor is created between bank and depositor, and that the bank becomes the depositor's agent, bailee, or trustee.  *  *  *"

Also see 5 Zollman, Banks and Banking, 571, § 3603, where it is said:

"A specific deposit primarily belongs to the depositor. Where the purpose of a specific deposit fails, the bank therefore becomes liable to him for

the return of the money, and the depositor may recover it as upon an implied promise to repay it. * * *''

In *First Nat. Bk. v. State Bk. of Portland,* 119 Or 601, 604, 222 P 1079, we held:

''Where a certain specific sum of money is delivered to a bank with directions to transmit that particular money or to substitute other money in place of it and then transmit the substituted money to a particular person or bank, the relation of principal and agent, as well as that of bailor and bailee, arises from the transaction. The bank's possession of the money is that of a bailee, and in carrying out the instructions of the owner of the money the bank acts as agent for the owner. This fiduciary relation of the bank in respect to the money is in the nature of a trust, and the trust continues until the money is sent in conformity to the given directions. *As long as the money remains in the possession of the bank, the party delivering it to the bank is both the legal and beneficial owner of it.* As the title to the money does not pass to the bank, the money itself does not belong to the bank and become a part of its funds. If the contract is that the bank shall not transmit the particular money delivered to it, but shall substitute other moneys for it, such as currency in place of gold, or the like, and then transmit the substituted money, the bank, in making such substitution and transmission, is acting as agent for its principal in respect to the business of its principal, and hence the fiduciary relations between the bank and its principal in respect to the substituted money, so long as it is in the hands of the bank, is not defeated, but continues unaffected by the fact that other moneys have been substituted for those originally paid to it. * * *'' (Italics ours.)

It will be observed that each of the foregoing definitions emphasizes the element of ownership in the one

creating the specific deposit. It therefore follows that Morrill had an ownership interest in the funds from June 9 until the date of the conference held on June 24.

We now press our inquiry to learn whether Morrill parted with that interest at any time prior to the filing of the government's first lien for the assessment of delinquent taxes.

We recall that Double O's letter of June 16, 1948, addressed to Moore Mill and threatening to hold that corporation for the value of logs cut by Morrill and sold to Moore Mill, precipitated a situation which momentarily threatened the continuity of negotiations for any agreement between Moore Mill and Morrill with respect to such timber. This resulted in the conference held on June 24 in Moore Mill's Bandon office with D. H. Miller, Sr., president of the Moore Mill corporation, Robert S. Miller, vice president of Moore Mill and one of its legal counsel, and Collier H. Buffington, the attorney and agent for Morrill. It had as its objective some form of protection for Moore Mill against the action threatened by Double O. This had the full cooperation of Morrill, acting through its counsel and agent.

The tangible fruits of this conference were (1) approval of the form of agreement between Moore Mill and Morrill which was dated June 10, 1948, although actually executed shortly after the conference of June 24; and (2) the letter of modification to the bank dated June 24. More important, however, was the transfer from Morrill to Moore Mill of Morrill's interest in the deposit of $6,500 made on June 9. From Robert Miller's testimony we get an uncontradicted account of what transpired at the June 24th meeting wherein he said: "* * * so on June 24th we agreed with Mr. Buf-

fington that that money which was on deposit in the bank was the Moore Mill & Lumber Company money * * * "

■ This unchallenged account of what then occurred confirms in us the belief that any right, title or interest of Morrill in the $6,500 in question was terminated as of June 24, 1948, and, as a consequence, the United States at no time has had a lien thereon.

The decree of the circuit court is affirmed.