UNITED STATES of America, Plaintiff-Appellee,

v.

Donald RUNNING, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Clayton BLUE, Defendant-Appellant.

Nos. 73–1848 and 73–1858.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 10, 1974.

Decided Nov. 25, 1974.

Rehearing Denied Dec. 17, 1974.

Raymond Rosenberg, Des Moines, Iowa, for defendant-appellant, Running.

James R. McManus, Des Moines, Iowa, for defendant-appellant, Blue.

Keith E. Uhl, Asst. U. S. Atty., Des Moines, Iowa, for appellee.

Before GIBSON, Chief Judge, BRIGHT, Circuit Judge, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

These appeals arise from the convictions of Donald Running and Clayton Blue, after separate jury trials, of conspiracy to violate the federal banking laws. The prosecutions followed the collapse in February, 1970 of the State Bank of Prairie City, Prairie City, Iowa, a federally insured bank (hereinafter the Bank). A seven count indictment was returned, two of which, Counts 5 and 7, concern us here. Count 5 charges Harry F. Soults, Donald B. Running, Clayton Blue and Robert Oehlert with conspiracy under 18 U.S.C. § 371[1] to violate 18 U.S.C. § 656[2] by agreeing to cause the withdrawal of $40,000 from the escrow account of Caravel Productions (held at the Bank) for purposes other than those stated in the escrow agreement. Count 7 charges the same four individuals with a similar offense with respect to $80,000 withdrawn from the escrow account of the Iowa-Minnesota Commodity Fund. Running was tried with Oehlert on Count 5 and convicted. (Oehlert was acquitted.) Blue

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. 18 U.S.C. § 371 provides in pertinent part:
   If two or more persons conspire * * * to commit any offense against the United States, * * * and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 656 provides in pertinent part:
   Whoever, being an officer, director, agent or employee of, or connected in any capacity with any * * * insured bank, * * * embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director [or] employee * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both * * *.
   As used in this section, * * * "insured bank" includes any bank, * * * the deposits of which are insured by the Federal Deposit Insurance Corporation.

was tried alone on Counts 5 and 7 and convicted. A subsequent trial of Running and Oehlert on Count 7 resulted in an acquittal when the jury was unable to reach a verdict. The charges in Counts 5 and 7 against Soults, the Bank president, were dismissed after he plead guilty to two other counts and testified for the Government.

Running and Blue raise substantially identical claims of error. It is contended as to Count 5 that the competent evidence presented at their separate trials was insufficient to establish the existence or terms of the alleged escrow agreement between the Bank and Caravel Productions. Thus, it is argued, the trial courts should have granted their motions for judgment of acquittal since there could be no "misapplication" of funds within the meaning of 18 U.S.C. § 656 if the Bank owed no fiduciary duty with respect to the funds deposited to the account of Caravel Productions. This claim is based in large part on the fact that no written escrow agreement exists. The question presented to the juries, then, was (as the court instructed them): "whether the depositors and the [Bank] by their words and actions as shown by the evidence intended to create an escrow agreement for the 'Caravel Productions Inc. Escrow Acct.' " [3]

■ The records in both cases are voluminous; we have reviewed them in their entirety. After careful consideration of defendants' claims and of all the evidence, we are satisfied that substantial competent evidence supports the verdicts, and that the trial court did not err in refusing to enter judgments of acquittal. *See* United States v. Quinn, 467 F.2d 624, 627 (8th Cir. 1972), cert. denied, 410 U.S. 935, 93 S.Ct. 1390, 35 L.Ed.2d 599 (1973); United States v. May, 419 F.2d 553, 555 (8th Cir. 1969). It would unduly burden the reports to detail the complexities of the conspiracy proven; we merely outline the evidence from which the juries properly

could have concluded beyond a reasonable doubt that an escrow account existed and that funds therefrom were misapplied.

I. *The defendants' past dealings.* Running and Blue were the promoters of a number of enterprises (such as the Iowa-Minnesota Commodity Fund, the subject of Count 7) organized along a common pattern involving the deposit of investors' seed money in escrow until sufficient capital was raised to begin operations (usually $100,000 or $150,000). If the stated amount was not raised, the escrow agent was obligated to return the investors' deposits. The Bank was well aware of this pattern.

II. *The promotion of Caravel.* Caravel Productions, Ltd. was a limited partnership organized by defendants for the purpose of making a motion picture. Investors were induced to subscribe to $10,000 "units" or shares in the enterprise and thereby become limited partners. Part of the Articles of Limited Partnership of Caravel Productions Limited reads:

### ARTICLE III

### CAPITAL AND PROFITS (LOSSES)

A. CAPITAL OF PARTNERSHIP. THE TOTAL CAPITAL OF THE PARTNERSHIP SHALL BE AS FOLLOWS:

\* \* \* \* \* \*

2. FIFTEEN (15) UNITS OF LIMITED PARTNERSHIP INTEREST AT A PER UNIT CASH CONTRIBUTION OF TEN THOUSAND DOLLARS ($10,000.00), AGGREGATING ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00).

B. ESCROW OF LIMITED PARTNERS CAPITAL. INITIALLY, ALL CAPITAL CONTRIBUTIONS MADE BY LIMITED PARTNERS PURSUANT TO THIS

---

3. Caravel was also known as "Carvel."

AGREEMENT SHALL BE DEPOSITED IN AN ESCROW ACCOUNT AND HELD BY AN ESCROW AGENT. THE ESCROW AGENT IS NOT TO RELEASE ANY FUNDS UNTIL ALL OF THE DOCUMENTATION AND AGREEMENTS HAVE BEEN COMPLETED AND A COPY OF WHICH IS IN HIS POSSESSION, THEREAFTER THE ESCROW AGENT SHALL RELEASE AND DISBURSE THE FUNDS SO HELD UPON RECEIPT BY HIM OF SATISFACTORY DOCUMENTATION OF EXPENDITURES INCURRED, OR WHICH ARE NECESSARY TO INCUR TO ALLOW THE GENERAL PARTNER TO CARRY OUT THE PURPOSES OF THE PARTNERSHIP, IT BEING THE PURPOSE OF SUCH ESCROW TO ASSURE TO THE EXTENT POSSIBLE, THE EXPENDITURE OF LIMITED PARTNERS' CAPITAL FOR MOTION PICTURE PRODUCTION ONLY AND NOT FOR PURPOSES UNRELATED TO THOSE FOR WHICH THE PARTNERSHIP WAS ESTABLISHED.

\*     \*     \*     \*     \*     \* [4]

Nineteen checks drawn by investors (amounting to $134,000) were deposited to Caravel's account at the Bank. In fifteen of these (amounting to $99,000) the payee was denominated of "Caravel Productions, Inc., Escrow Account," "Caravel Production Escrow," or some similar term using the word "escrow." On file at the Bank at the time of its closing were an unexecuted copy of the document quoted in part above, and copies of the subscription agreements signed by most of the investors whose money was deposited in the Bank.

III. *Treatment of the Caravel account and its funds by the Bank.*

Caravel's account was carried on the Bank's records as an escrow account. In various transactions involving the account it was labeled as such. Seventy thousand dollars ($70,000) from the account were transferred to an escrow account in a California bank. A copy of the California escrow agreement was on file at the Bank showing that the funds would be used only for expenses incurred in the production of a movie. Forty thousand dollars ($40,000), however were proven to have been withdrawn and used for purposes other than making a movie.

IV. *Defendants' statements.*

Soults testified that the account was established at the instance of one or both of the defendants who stated it was to be an escrow account from which money would be transferred to California for the purpose of making a film.[5]

We think this summary fairly presents the rather overwhelming evidence that the parties intended to and did create an escrow account at the Bank, the purpose of which was to protect the investors' funds from being applied for nonmoviemaking purposes. Defendants argue that merely the naming of the fund as an "escrow account" by the depositor [6] or the bank [7] does not make it one. We agree, and the juries were so instructed. But this is not to say that such denomination is not a circumstance which may be taken into account by a jury, since the "use of the word 'escrow' by any of the parties indicates more clearly than any other their actual intention." [8] Defendants also argue that

---

4. At Running's trial several investors confirmed that the substance of these promises had been made orally to them at the time they purchased their units.

5. Defendants object that Soults was permitted to testify at both trials that he believed an escrow account had been established. We find no prejudicial error in the admission of such testimony.

6. Citing American Service Co. v. Henderson, 120 F.2d 525, 530 (4th Cir. 1941).

7. Citing Moore Mill & Lumber Co. v. Curry County Bank, 200 Or. 558, 568, 267 P.2d 202, 206 (1954).

8. Lechner v. Halling, 35 Wash.2d 903, 913, 216 P.2d 179, 185 (1950).

as a matter of law no escrow agreement can exist unless there are at least three parties to it, and that only two were shown here.[9] Defendants' cited cases [10] do not support this conclusion. There was proof of the underlying agreements between the investors and Caravel that their funds would be deposited in escrow.[11] It was shown, as well, that the conditions of such deposit were communicated to the Bank and that it undertook to honor them.[12] It is clear that the existence of the Bank's obligation to the investors was sufficiently established. There was, in our judgment, substantial evidence to support defendants' convictions on Count 5.

With respect to Count 7 (on which Blue alone was convicted) there was no question that an escrow account existed in the name of Iowa-Minnesota Commodity Fund and that $80,000 had been transferred out of the account in violation of the escrow agreement. Seventy-five thousand ($75,000) Dollars of this amount were deposited to the account of another of defendants' ventures, the Paint Corporation of America (PCA), from which it was immediately disbursed. Three transactions in January and February 1970 were involved, which were accomplished at the Bank by Mr. Soults who simply debited the escrow account and credited the PCA account. He testified that he was directed to perform these transactions once by Running and twice by Blue.

The gist of Blue's defense was that Soults had performed these transactions without his knowledge or authorization. He testified that it was his understanding that the PCA account would be funded by an indeterminate amount of credit, not to exceed $100,000, extend-

ed by the Bank. Soults, however, denied that he had agreed to extend PCA a "line of credit."

At the third trial (of Running and Oehlert on Count 7) the defense produced a letter from Soults, apparently written to his lawyer after the bank closing. In part it states:

> In regards to my dealings with Robert Oehlert, Clayton Blue and Donald Running.
>
>    *     *     *     *     *     *
>
> They then approached me about a personal loan for each for a project of their own called Paint Corp. of America. I agreed to loan each individual $25,000.00. They said if further funds were needed they would be able to transfer from the various escrow accounts they were establishing.
>
> They needed more funds and requested I transfer funds for them at various times, they in turn gave me signed notes to represent their obligation to the funds. These notes were to be repaid at their request from the sales of francises [sic] of Paint Corp. of America.
>
> They were never able to sell anything to be able to return funds to the escrow accounts.

Confronted with the letter, Soults denied any present memory of having agreed to advance credit for the purpose of funding PCA. He admitted authorship of the letter and acknowledged that his prior testimony could have been mistaken since "According to the letter, I agreed to loan each individual $25,000.'

Defendant Blue moved for a new trial claiming the letter was newly discovered evidence and that as a result thereof

---

9. Defendant Running: "There was no third party to whom the [Bank] owed any duty or any obligation." Defendant Blue: "There is no proof of any three-party agreement * * *. * * * If the contract is merely between the depositor and the bank, it could be changed at will without regard to the rights of the third party and a case like that is not a true escrow account."

10. Notes 11 and 12, *infra.*

11. Johnson v. Wallden, 342 Ill. 201, 206, 173 N.E. 790, 792 (1930); Gholson v. Thompson, 298 S.W. 318, 320 (Tex.Civ.App.1927).

12. Lechner v. Halling, 35 Wash.2d 903, 913, 216 P.2d 179, 185 (1950).

Soults had "made a substantial and material change in the testimony which he gave in the trial of this Defendant's case." The motion was denied.

 We find no error in the court's ruling. Blue's motion was addressed to the sound judicial discretion of the trial court whose ruling will not be disturbed except for a clear abuse of that discretion. Batsell v. United States, 403 F.2d 395, 403 (8th Cir. 1968), cert. denied, 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 785 (1969). Considerations of defendant's diligence in discovering Soults' letter aside, it has not been conclusively demonstrated to us that the new evidence "would probably produce an acquittal." Id. For the letter is corroborative of the essential aspect of the Government's case, that defendants directed the transfer of funds out of the escrow accounts. Moreover, Soults' testimony that he had agreed to loan defendants $25,000 each to fund PCA is entirely consistent with the Government's proof that of approximately $164,000 expended from the account of PCA, $60,000 came from loans to Running and Blue and the rest came from the Iowa-Minnesota Commodity Fund escrow account and the Romar Productions escrow account.[13]

Defendant Running also moved for a new trial (on Count 5) based on the discovery of Soults' letter and his changed testimony. In addition to what we have said above, we find the new material only marginally relevant to the charges against Running in Count 5. Although some of the funds misapplied from the Caravel account were used to pay a debt of PCA, no such funds were transferred to PCA's account at the Bank. The argument that Shoults should have used the "line of credit" to cover checks drawn on the PCA account thus has no material bearing with respect to Count 5. Running's motion was properly denied.

The judgments are affirmed.

---

13. Romar Productions was still another venture of defendants.