Richard O. JACOBSON, Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant,

and

Federal Deposit Insurance Corporation, as Receiver of State Bank of Prairie City, Prairie City, Iowa, Intervening and Counterclaiming Defendant.

Civ. No. 73–163–2.

United States District Court, S. D. Iowa, C. D.

Jan. 23, 1976.

Frank W. Davis, Jr., Charles H. Dick, Jr., and T. Scott Bannister, Des Moines, Iowa, for plaintiff.

B. C. Clayton and R. Eugene Knopf, Newton, Iowa, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

HANSON, Chief Judge.

Plaintiff Richard O. Jacobson commenced this lawsuit on August 17, 1973, seeking monetary recovery from the Federal Deposit Insurance Corporation (FDIC) in its capacity as insuror of the deposits of the State Bank of Prairie City, Iowa (the Bank). Plaintiff asserts that he had a $15,000 deposit in the Bank at the time it was closed by the State of Iowa in February of 1970, and that he is entitled to insurance coverage in this amount. An answer to plaintiff's complaint was filed by the FDIC on October 23, 1973. Some months thereafter, the FDIC, in its capacity as receiver of the Bank, intervened and counterclaimed against Jacobson, asserting a set-off pursuant to 12 U.S.C. § 1822(d). The counterclaim and set-off are based upon a $12,500 note which was executed by Jacobson to the Bank. It is the receiver's contention that this note has never been paid, and is still due and owing.

This Court has jurisdiction over the main claim, *Jacobson v. FDIC* as an insuror, under 12 U.S.C. § 1819 and 28 U.S.C. § 1331(a). *Freeling v. Sebring,* 296 F.2d 244 (10th Cir. 1961). In addition, the Court has ancillary jurisdiction over the counterclaim and set-off made by the intervenor, the FDIC as receiver. 12 U.S.C. § 1822(d).

## THE MAIN CLAIM

The parties are in complete agreement that Jacobson made a $15,000 deposit in the State Bank of Prairie City which he never withdrew, for which he is entitled to deposit insurance from the FDIC. Accordingly, judgment to that effect will be entered, at 7% interest from the date of judgment entry.

## THE ANCILLARY CLAIM—FINDINGS OF FACT

1. On July 29, 1969, Richard Jacobson borrowed $12,500 from the State Bank of Prairie City. This money was placed in a checking account at the Bank on August 5, 1969. In exchange therefor the Bank accepted Jacobson's promissory note, in the amount of $12,500 plus 8½% interest.

2. The $12,500 loan was approved by Harry F. Soults, the Bank's president. Soults was first employed by the Bank in April of 1962 as manager and cashier. In 1967 he became president and his brother-in-law, Richard Graves, became cashier. By July of 1969, Soults and Graves had purchased the stock of the Bank, and at all times thereafter, Soults personally owned more than fifty percent of the Bank's stock. During the period from April of 1962 until the Bank was declared insolvent and closed by the State of Iowa on February 22, 1970, Soults was the Bank's principal operating officer. He personally approved all bank loans in dollar amounts of four figures or more; he personally received payments on loans and, from time to time, performed all banking functions of the Bank; he personally supervised all employees, including the bookkeeper, and once he became president, he also supervised the cashier; he personally decided what action would be taken by the Bank concerning checks which overdrew an account, and he alone determined whether a given overdraft would be paid, held, or returned for insufficient funds; he held himself out to the community of Prairie City as "the man-in-charge" of the Bank and he was so regarded by the local populus.

3. Jacobson utilized the $12,500 to purchase one unit of stock in a movie-making venture, "Romar Productions," from one Clayton Blue.

4. On or about February 3, 1970, Blue and Robert Oehlert requested that Soults open a checking account in the Bank to be named the "Caravel Productions Escrow Account" (the Caravel Account). Between February 3 and February 20, 1970, Blue and Oehlert brought funds to the Bank and made six deposits to this account in the aggregate amount of $104,000. Soults knew that in addition to Blue and Oehlert, one Donald Running was associated with Caravel Productions as its president. On or about February 17, 1970, Blue requested that Soults open a checking account in the Bank to be entitled C and B Investment Co. On that date, $25,000 was deposited to this account, and the sum of $24,095.82 was withdrawn therefrom by checks, leaving a balance of $904.18.

5. On February 20, 1970, Blue telephoned Jacobson and said the $12,500 note still was owing and would need to be paid. Jacobson told Blue to pay the note, because the proceeds thereof previously had been given to Blue. Thereafter, Blue went to the Bank, where he met Soults. He told Soults to transfer $15,000 from the Caravel account to the C & B account. Soults then prepared a check on the Caravel account; Blue signed the same; Soults deposited the check in the C & B account; the check was paid unconditionally by the Bank on that date.

6. After depositing the $15,000 in the C & B account, Blue then drew a draft on the C & B account payable to the Bank in the amount of $13,093.25—which was the sum of principal and interest due on the Jacobson note. This draft was given to Soults, who typed the words "C & B Investment Company" above the signature line, deposited the check in the Bank, and effected unconditional payment of it by the Bank on February 20, 1970. Soults then credited the proceeds of the C & B account check to the liability ledger card of Jacobson, leaving a zero balance; he wrote "Paid

2-20-70 H.F.S. 592.25" on the face of the note and he gave the note to Blue.

7. The evidence at the trial disclosed that on February 20, 1970, Clayton Blue, in the presence of Harry Soults, president of the Bank, made an unauthorized withdrawal of $15,000 from the Caravel Productions escrow account at the Bank by a check made payable to C & B Investment Co. Harry Soults typed the check which Blue signed. There was no signature card for Caravel Productions escrow account at the Bank and Soults knew this. Harry Soults testified that he didn't believe Clayton Blue had any authority to write checks on Caravel Productions Escrow account. He said the check Blue wrote was unauthorized. The $15,000 from Caravel was deposited to the C & B Investment Co. account at the Bank on February 20, 1970. At the same time and place, Clayton Blue wrote a check on the C & B Investment Co. account at the Bank in the amount of $13,093.25 payable to the State Bank of Prairie City, as purported payment of Richard O. Jacobson's note. Harry Soults marked the note "Paid," when he knew the note had not been effectively, validly, actually and lawfully paid. Harry Soults knew that Clayton Blue was attempting to pay Richard O. Jacobson's note with Caravel Productions Escrow account money. Harry Soults knew that the payment was not proper and legal.

8. On the afternoon of February 20, 1970, Blue gave the note to Jacobson, in whose possession the instrument remained until the time of trial. Blue told Jacobson the note had been paid with monies of C and B Investment Company, and in exchange for such payment, Blue asked Jacobson for a promise to repay C & B. Jacobson then signed another writing denominated as a promissory note in the amount of $13,093.25 providing for payment to C and B Investment Company on March 13, 1970.

9. On March 2, 1970, Jacobson drew a draft on his checking account in the amount of $13,093.25 payable to one Lloyd Huffer, who was an accountant for Blue. Jacobson gave this check to Blue and Oehlert; the latter then wrote "Paid in full March 2, 1970. R. B. Oehlert" on the instrument. Oehlert gave the instrument to Jacobson, in whose possession the instrument remained at the time of trial. Jacobson's check was paid unconditionally by the Iowa-Des Moines National Bank on March 4, 1970.

10. On February 23, 1970, the District Court of Iowa for Jasper County appointed the FDIC as receiver of the State Bank of Prairie City.

11. On December 14, 1973, the District Court for Jasper County entered certain Findings of Fact and Conclusions of Law in the matter of receivership proceedings involving the Prairie City Bank. The Court expressly ruled that Clayton Blue's withdrawal of $15,000 from the Caravel account was illegal and unauthorized. The FDIC, as receiver, was ordered to pay the $15,000 back to the receiver for Caravel Productions.

## CONCLUSIONS OF LAW

The parties' contrasting legal arguments regarding Jacobson's present liability on the $12,500 note can be stated rather simply. The FDIC has taken the position that Blue's payment of the Jacobson note should be cancelled because it was made with tainted money that Soults knew as tainted. Since the FDIC as receiver "stands in the shoes" of the Bank, it is entitled to the proper payment that the Bank never received. In the view of the FDIC, Jacobson cannot "accept the benefits of a fraud without also accepting the fraud itself." Jacobson, however, argues that insufficient evidence has been presented on the question of whether Blue's payment of the note was proper. He asserts that Soults, as the principal operating officer of the Bank, had authority to accept payment for the note, and that since he has acknowledged good payment on behalf of the Bank, that acknowledgment cannot now be rescinded. Because the FDIC stands in the Bank's shoes, the Bank's acceptance of payment deprives the FDIC of any claim against Jacobson.

The Court finds that it is unable to adopt completely the position of either party. As the preceding Findings of Fact reflect, the Court rejects plaintiff's contention that Soults was unaware of Blue's lack of authority to utilize Caravel funds for the payment of Jacobson's note. In a nutshell, this case boils down to the legal effect of Jacobson's note being paid by tainted money, under circumstances where Soults knew of the money's tainted condition. It is the Court's conclusion that Soults' knowledge of the source of Blue's funds can be imputed to the Bank. Under those circumstances, the Bank could not recover from Jacobson; the FDIC, standing in the Bank's shoes, fares no better. Thus, the counterclaim of the FDIC must be dismissed.

■ Initially, the Court will again stress its belief that there can be little doubt as to Soults' knowledge of the tainted nature of Blue's funds. Harry Soults' familiarity with Clayton Blue, Donald Running, Robert Oehlert, and the entities of Romar and Caravel Productions extends far beyond the parameters of this case. See generally *United States v. Running*, 506 F.2d 1068 (8th Cir. 1974). Soults knew that the Bank had no signature card for the Caravel Escrow Account in 1970. He testified before this Court that he did not believe Clayton Blue had the authority to utilize Caravel funds. Further, Soults took an active role in the transfer of the funds from Caravel to C & B to pay off Jacobson's note. The facts compel a finding that Soults had full knowledge that Jacobson's note had been paid by improperly obtained funds when he cancelled it on February 20, 1970. See also *Fritz v. State Bank of Prairie City*, Equity No. 28161, Jasper County District Court.

The argument that Soults knew of the source of Blue's funds has been strenuously advocated by the FDIC. The Court fully adopts the FDIC's arguments in this regard. The Court also deems that Soults' knowledge must be imputed to the Bank, however, and hence to the FDIC.

Finding 2, *supra*, fully supports the conclusion that the Prairie City Bank was a "one man" bank in 1969 and 1970, the period crucial to this case. Thus, Soults' knowledge can be imputed to the Bank under the "sole actor" doctrine:

It is well settled that a principal is ordinarily chargeable with the knowledge acquired by his agent in executing the agency and is subject to the liabilities which such knowledge imposes.

The general rule that knowledge on the part of an agent is imputed to his principal is subject to the well-recognized exception that the agent's knowledge will not be imputed to his principal where the agent is acting adversely to the interests of his principal. Under these conditions there is a presumption that since he is acting adversely to the interests of his principal he would not communicate the fact of the controversy to his principal but would for that reason alone probably conceal the facts from the principal. . . . However, this exception is not applicable under any one of the three following circumstances: (1) Where the interested official is the sole representative of the two contracting parties; (2) where the corporation benefits by the transaction; and (3) where the interested agent acts for the principal, instead of dealing with him in which case, the presumption of communication obtains.

*Federal Deposit Ins. Corp. v. American Surety Co.*, 39 F.Supp. 551, 555–56 (W.D.Ky.1941) (citations omitted).

In *American Surety* a fraudulent conversion of the assets of an estate was carried out by the bank president. The bank's liability to the estate hinged solely on whether the president's knowledge of his own wrongdoing was attributable to the Bank. The Court found that the president

was the sole representative of the estate of the incompetent. He was also the sole representative of the Taylor National Bank in the transaction. His

position by which practically all of the stock of the Taylor National Bank was owned by himself or by members of his family made him the dominating personage in the bank. It was a typical one-man bank. The "sole actor" doctrine as discussed and referred to in the foregoing cases is applicable to the present case. By reason of these facts and the law applicable to them the Taylor National Bank became liable to the estate of John Catron for the assets of said estate so converted by Morton to his own use. *Id.* at 556.

■ The "sole actor" doctrine was recognized by the United States Court of Appeals in a banking context, in *City National Bank v. Vanderboom*, 422 F.2d 221, 231 (8th Cir. 1970):

> The general agency rule that knowledge acquired by an officer or agent of a corporation while acting in his official capacity or within the scope of his duties will be imputed to the corporation is applicable to banks. . . . However, where it is in the officer's interest to conceal his knowledge, his knowledge will not be imputed to the bank unless he is the sole representative of the bank in the transaction. *Id.* at 231.

Finally, the "sole actor" doctrine is a recognized aspect of Iowa agency law. *Nissen v. Nissen Trampoline Co.*, 241 Iowa 474, 39 N.W.2d 92, 96–97 (1949).

■ As previously stated, facts of this case leave no doubts that the State Bank of Prairie City was a "one-man" bank in 1969 and 1970. Soults, the Bank's sole actor, accepted payment of Jacobson's note by Blue, knowing of Blue's lack of authority to utilize Caravel funds. Under these circumstances, the Bank's acceptance of payment cannot now be rescinded. The situation is analogous to the facts of *Matanuska Valley Bank v. Arnold*, 223 F.2d 778 (9th Cir. 1955). In that case Davis, a building contractor, formed a joint venture with Arnold, his financier. Davis has no authority to execute notes on behalf of the venture; he did so, however, and Mrs. Arnold refused to pay the bank. Maze, the bank mana-

ger, was fully aware of the circumstances involving the Davis-Arnold agreement, and Davis' lack of authority. The bank brought suit against Mrs. Arnold on the three notes. The trial court held in defendant's favor, imputing the knowledge of Maze to the bank. The appellate court affirmed this ruling, stating as follows:

> We now consider whether Davis had apparent authority to bind the firm. Maze, the manager of the bank, was fully conversant with the agreement between Davis and Mrs. Arnold and the circumstances surrounding it. If the knowledge of Maze can be imputed to the bank there can have been no apparent authority. The bank argues that the knowledge of its agent, Maze, should not be imputed to it for the reason that Maze was acting adversely to the interests of appellant, his principal. This argument is bottomed on a finding of the trial court that a scheme existed on the part of Maze and Davis to defraud Mrs. Arnold and that said scheme involved covertly extending the bank's credit to Davis on behalf of the firm for use on other than firm's business.
>
> But assuming that Maze was acting adversely to appellant, his principal, his knowledge should nevertheless be imputed to appellant under the sole actor doctrine. *Munroe v. Harriman,* 2 Cir., 1936, 85 F.2d 493, 111 A.L.R. 657, certiorari denied *Harriman Nat. Bank & Trust Co. v. Munroe*, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443; cf. Restatement, Agency, § 282, sub. c. Maze was the manager of the bank and appears to have been in complete charge of its affairs; he was the sole representative of the bank in all dealings connected with the execution of the notes upon which this suit is brought. The bank is foreclosed from taking the inconsistent position of claiming on the one hand apparent authority based upon dealings with its sole agent, Maze, and on the other hand disclaiming the imputation of Maze's knowledge. That Maze was a sole actor is

made more apparent by the fact that the bank was situate in a small town and it is common knowledge that in such places a banker has quite a close acquaintanceship with the residents and their business transactions. *Id.* at 780–81.

 Under Iowa law, "a negotiable instrument is discharged when the principal debtor becomes the holder thereof at or after maturity in his own right." *Hamilton v. Bethel*, 256 Iowa 1357, 131 N.W.2d 445 (1964). *See* § 554.3601, Code of Iowa (1975), which replaced, and is "in accord with" § 541.120(5) of the Uniform Negotiable Instrument Law, the law applied in *Bethel.* Further, Iowa law provides that if the holder consents, payment of a note may be made by a person other than the maker. § 554.3603, Code of Iowa (1975). In this case, Soults, acting for the Bank, accepted Blue's payment of Jacobson's note. Said payment was made by way of a check drawn on the C & B account at the Bank, which was paid unconditionally. There is absolutely no evidence in this record which indicates that Jacobson had any awareness of the circumstances under which Blue paid off his note. Thus, the situation is one where Soults (hence, the Bank) accepted a third party's payment of Jacobson's note. The note was marked "Paid," and given to Blue, who later gave it to Jacobson. Under these circumstances, and especially in light of the fact that the Bank knew the source of Blue's funds and Jacobson did not, Jacobson's obligation to the Bank was effectively discharged. *See* §§ 554.-3601–.3606, Code of Iowa.

■ The FDIC, as receiver for the State Bank of Prairie City, "stands in the shoes" of the Bank. It can enjoy no greater rights against Jacobson than the Bank could. *Landy v. F.D.I.C.*, 486 F.2d 139, 147–48 (3d Cir. 1973); *F.D.I.C. v. Glickman,* 450 F.2d 416, 419 (9th Cir. 1971); *DeLorenzo v. F.D.I.C.,* 259 F.Supp. 193, 198 (S.D.N.Y.1966). Thus, the discharge of Jacobson in relationship to the Bank is a discharge in relationship to the FDIC as well. As a result, the receiver's counterclaim and set-off must fail.

Accordingly, it is hereby ordered that plaintiff shall recover $15,000.00 from the Federal Deposit Insurance Corporation, with interest at 7% per annum from the date of the judgment.

It is further ordered that the counterclaim of the Federal Deposit Insurance Corporation is dismissed.

It is further ordered that the above shall constitute the Findings of Fact, Conclusions of Law and Order for Judgment in this case. *See* Rule 52(a), F.R. Civ.P.